**UNITED STATES of America, Plaintiff,**

v.

**ONE LOT OF U.S. CURRENCY TOTALLING $14,665, Manuel J. Espinola, Claimant.**

**No. Civ.A. 97–12636–NG.**

United States District Court, D. Massachusetts.

July 2, 1998.

---

Shelbey D. Wright, United States Attorney's Office, Boston, MA, for United States of America, plaintiff.

Blaine J. DeFreitas, Maynard, MA, for $14,665.00 in United States Currency, defendant, Manuel Espinola, claimant.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

## TABLE OF CONTENTS

I. *BACKGROUND* ...................................................... 50

II. *DISCUSSION* ...................................................... 51
 A. *Summary Judgment Standard* ................................. 51
 B. *Probable Cause under the Forfeiture Law* ................... 52
 C. *Analysis* .................................................. 53
 1. Espinola's Possession of $14,665 in Cash is Consistent with this Story ...... 53
 2. The Cash Purchase of the Airplane Ticket is not Suspicious in these
 Circumstances ........................................... 54
 3. The Use of Rubber Bands to Bind the Cash has Limited Probative
 Value ................................................... 54
 4. Espinola's Demeanor When Stopped by the Security Guards was not
 Suspicious .............................................. 54
 5. Espinola's Inability to Open his Briefcase adds Little to the Probable
 Cause Analysis .......................................... 55
 6. Espinola's Story about the Source of the Money is Reasonable and
 was Largely Confirmed ................................... 56
 7. Espinola's Las Vegas Plans were Plausible ............... 57
 8. The Positive Alert by the Narcotics Dog, even if Credited, adds Little
 in these Circumstances .................................. 57
 9. Claimant was never Arrested or Convicted in Connection with these
 Circumstances, nor does he have a Criminal Record ....... 58
 10. Claimant was not Dishonest with the Police .............. 59
 11. The Length of Espinola's Stay in Las Vegas Supports his Story ........... 59

IV. *CONCLUSION* ..................................................... 60

In this civil forfeiture proceeding arising under 21 U.S.C. § 881, the government seeks forfeiture of $14,665 in U.S. currency that it claims was associated with drug trafficking. Claimant Manuel J. Espinola ("Espinola"), from whom the money was seized, moves for summary judgment, asserting that his interrogation violated the Fourth Amendment, and that, in any case, the government has failed to establish probable cause to institute forfeiture proceedings. The government has cross-moved for summary judgment, arguing that it has already met its burden of showing probable cause, and that Espinola has failed to refute it.

Even in the byzantine world of forfeiture law, this case is an example of overreaching. The government's showing of probable cause is completely inadequate, based on a troubling mix of baseless generalizations, leaps of logic or worse, blatant ethnic stereotyping.

The government presents a slightly nervous young man, carrying $14,665 in cash, en route to Las Vegas to find a new home. The man accurately reported his identity and prior to the initiation of forfeiture proceedings, largely confirmed his employment. No criminal charges were brought; indeed, the young man had no criminal record of any kind. The circumstances of the case barely cross the threshold of suspiciousness, let alone probable cause to believe that the money meets the standards for forfeiture.

 Forfeitures, the seizure of a citizen's property, are "strong medicine, disfavored in our jurisprudence." *U.S. v. One Parcel of Real Property*, 964 F.2d 1244, 1248 (1st Cir.1992). The possession of cash, even in large amounts, does not create a rebuttable presumption that one is engaged in criminal activity. *U.S. v. $36,634*, 103 F.3d 1048, 1055 n. 9 (1st Cir.1997). To do so would be to put at risk virtually anyone who does not bother to carry "appropriate" documentation for their cash. This would be especially so for those citizens who are already the most vulnerable—minorities, the young, and the poor.

Neither the courts nor Congress are empowered to suspend the Constitution so that the government may more effectively wage the war on drugs. *See*, e.g. *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). A democracy, after all, does not require that its citizens explain themselves, their plans, and their intentions to the government, absent lawful justifica-

tion, carefully considered. And it certainly does not permit the seizure of a citizen's property, as here, without probable cause. To find probable cause in these circumstances would require me to cast these concerns to the wind. This I cannot do.

Espinola's motion for summary judgment is **GRANTED.**[1] The government's cross motion for summary judgment is **DENIED.**

## I. *BACKGROUND*

The claimant, Manuel J. Espinola, does not contest any of the facts that are set out in the affidavit of Stephen G. Lynch ("Lynch"), the Massachusetts state trooper who seized the currency. The facts set forth below are thus taken entirely from Lynch's affidavit.

According to Lynch's affidavit, on November 7, 1996, Lynch and another trooper, who were stationed at Boston's Logan airport, responded to a call from a security agent at the America West/Delta Shuttle security checkpoint. Upon arriving at the checkpoint, the troopers met with the security agent, Lilian Pineda of Argenbright Security Co., who told them the following: At approximately 7:45 a.m., a passenger, later identified as the claimant, approached the security checkpoint and placed his bags on the belt of the x-ray machine. The x-ray image of one of his bags, a black briefcase, showed a "dark block" that caused the security guards to be concerned. Pineda asked Espinola to open the bag. According to Pineda, Espinola became nervous and asked why he had to open the bag.

Initially, neither Espinola nor his travelling companion, later identified as his brother, could remember the combination to the briefcase. At some point, however, Espinola managed to get it open, and Pineda saw two large bundles of cash inside lying under some papers. Pineda informed Espinola that she would have to contact the state police. She reported that Espinola responded by becoming more nervous and upset, asking, "Why? Why do you have to call them?"

The troopers arrived and discussed the situation with Pineda. She identified Espinola, who was waiting in the check point area. Officer Lynch approached Espinola, identified himself, and asked to see some identification. Espinola showed him a driver's license with his name on it, a 1973 birthdate, and a Tewksbury, Massachusetts, address. Lynch then asked to see Espinola's ticket. Espinola handed him a roundtrip ticket to Las Vegas, Nevada, that included a return date the following Monday, November 11. The ticket had been purchased with $505.50 in cash that morning.

When questioned about the money in the briefcase, Espinola told Lynch that he believed that there was $15,000 in the two bundles, and that it was money that he and his brother had made working for a company called Equinox International. Espinola did not have a business card identifying himself as an employee of Equinox International, nor could he remember its telephone number.

Lynch then asked Espinola where he had been keeping the money prior to that morning. Espinola responded that he had been keeping it at home because he was concerned about a prior problem with a bank account, and was afraid that a bank might attach his money for repayment.

Finally, Lynch asked Espinola what the money was to be used for. Espinola stated that he was planning to move to Las Vegas, and intended to use the cash as a down payment on a place to live. He did not know the name of the realtor with whom he was dealing, but stated that he had gotten the name from a cab driver the last time that he was in Las Vegas. Espinola stated that he had "just decided for sure" the night before to move to Las Vegas, but had been thinking about moving for a couple of weeks. Espinola stated that he intended to put a down payment on a place to live, return to Boston the following Monday, and then drive out to Las Vegas with his brother and the remainder of their belongings.

Espinola gave the name of a friend and fellow salesperson at Equinox International,

1. Since I find for the claimant based on the government's probable cause showing, I need not discuss his argument that the initial investi-gatory stop by the police violated his Fourth Amendment rights.

Mike Jasilewicz, who he was planning to meet once he arrived. He did not have a telephone number for the friend, but gave Lynch a "beeper" number for him.

After hearing this explanation, Lynch removed the money from the briefcase and examined it. It consisted mostly of twenty and fifty dollar bills, wrapped in bundles with several rubber bands on each end.

Lynch informed Espinola that he was seizing the money because he believed it was to be used for the purchase of illegal substances. He explained that Espinola was not under arrest, and that the money would be counted and turned over to the Drug Enforcement Administration (DEA). Lynch explained to Espinola that, if he wished, he could accompany him back to the police barracks and obtain a receipt for the money, and information on the procedure to follow if he wanted to file a claim to have the money returned. Espinola accompanied Lynch back to the barracks.

At the barracks, the money was counted and determined to be the sum of $14,745. Espinola received and signed a receipt, and left the office.

Lynch then placed the seized money in a manilla envelope, and put it in a room with four other envelopes that were identical in size and shape. The other four envelopes contained out-of-circulation shredded currency obtained from the Federal Reserve Bank. The five envelopes were presented to a trained drug detection dog, named "Alf." Alf alerted the officers to the odor of narcotics on the seized money, but did not alert to any of the other envelopes. The money was then placed in an evidence bag and delivered to the DEA. A recount at the bank the following day revealed that the amount of money was $14,665.

At some point, exactly when remains unclear, Espinola submitted documents which, for the most part, confirmed his statements about the source of the money. He offered material showing that he had purchased $5,000 worth of products from Equinox International, that the company indeed existed and made the kind of products that could well generate cash receipts, namely personal care products that are purchased by salespersons and then resold to the public. Espinola also submitted copies of a settlement check in the amount of $1,950.00 that he received in February of 1996, as a result of a personal injury claim.

Significantly, the government went no further to follow through on the material Espinola had provided. From the record before me, it does not appear that the government tried particularly hard. Lynch states that he has "not been able to verify that the beeper number which Espinola provided actually belonged to Mike Jasilewicz." (Jasilewicz was Espinola's friend, who could have verified that Espinola was, indeed, en route to Las Vegas to meet him, and who was a fellow salesman for Equinox products.) He does not mention what efforts he made, if any,

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In evaluating the record, the court views the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995).

The moving party must make an initial showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If it does so, then the burden shifts to the non-moving party to set forth specific material facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a party resists summary judgment by pointing to a factual dispute on which it bears the burden at trial, that party must point to evidence affirmatively tending to prove the fact in its favor. *F.D.I.C. v. Elder Care Services, Inc.*, 82 F.3d 524, 526–27 (1st Cir.1996). Here,

claimant does not contest any of the facts set out in Lynch's affidavit, but argues that they fail to satisfy the requisite legal standard for forfeiture.

### B. *Probable Cause under the Forfeiture Law*

The government brought this forfeiture action against the defendant currency under 21 U.S.C. § 881(a). Section 881, "Forfeitures," states:

(a) Subject property: The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

■ In civil forfeiture proceedings brought by the government under this section, U.S. Customs procedures control the allocation of the parties' burdens of proof. *$36,634*, 103 F.3d at 1053; 21 U.S.C. § 881(d). At the outset, the government must show that it has probable cause to believe that the property has the requisite nexus to a specified illegal purpose. *U.S. v. $68,000*, 927 F.2d 30, 32 (1st Cir.1991). While the specificity requirement does not oblige the government to trace the money to any particular drug transaction, it must "demonstrat[e] probable cause to believe either that the money represented the proceeds of a drug sale or that it was intended to be used in the purchase of drugs." *$36,634*, 103 F.3d at 1053 (citations omitted). Courts set a high threshold of particularity in a forfeiture complaint, noting the "concern for due process that arises by reason of the drastic nature" of the remedy. *U.S. v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 638 (1st Cir.1988).

■ Probable cause in a forfeiture proceeding means a "reasonable ground" for believing that the money is connected with illegal drug transactions. *$36,634*, 103 F.3d at 1054. "This standard requires more than 'mere suspicion' but less than 'prima facie proof.'" *Id.* A court should not determine probable cause from the evidence piecemeal, but rather from the aggregate of the facts, *U.S. v. $250,000*, 808 F.2d 895, 899 (1st Cir. 1987), and applying common sense. *U.S. v. One Parcel of Real Property*, 921 F.2d 370, 376 (1st Cir.1990). And, as the First Circuit has recently reminded us, the probable cause equation consists of many variables; probable cause findings are not invariably bound by precedent. *$36,634*, 103 F.3d at 1054, *citing U.S. v. 255 Broadway*, 9 F.3d 1000, 1004 (1st Cir.1993).

■ Finally, probable cause for forfeiture is measured by what the government knew at the time of the institution of the forfeiture proceedings, not at the time of the seizure. *255 Broadway*, 9 F.3d at 1004.

■ Once the government makes a threshold showing of probable cause, the burden shifts to the claimant to show by a preponderance of the evidence that the property is not subject to forfeiture. *$36,634*, 103 F.3d at 1053–54; *U.S. v. 1933 Commonwealth Avenue, Newton, Massachusetts*, 913 F.2d 1, 3 (1st Cir.1990).

The government asserts that the probable cause question is no longer subject to debate because, earlier in these proceedings, I signed a warrant for the seizure of the defendant *res*, a warrant explicitly based on a finding of probable cause for forfeiture. Reviewing the warrant now, in the light of an adversary proceeding—the original warrant was *ex parte*—I find that my original decision was, to put it plainly, dead wrong. I, perhaps like others in my position, was blinded by papers that heaped speculative inference on speculative inference.

The government's assessment that there is probable cause to believe that the subject currency is connected with a drug transac-

tion is based upon the aggregate of the following factors: the claimant was carrying $14,665 in cash, and could not produce any business card from his claimed employer; the money was bundled with rubber bands on the ends, "in a way that drug dealers commonly use"; he was nervous and upset when the airport security guard asked him to open his briefcase and later informed him that she was calling the police; he initially forgot the combination to his briefcase; he purchased his ticket in cash the day of the flight, for a stay of four days in Las Vegas; his explanation that he intended to use the money to put a down payment on a home was, according to the government, not credible, in part because he could not remember the name of the realtor with whom he was dealing; he did not have the telephone number of the friend that he was planning on meeting in Las Vegas; and a trained narcotics dog alerted positively for the presence of narcotics on the seized currency.

## C. Analysis

■ Based on these facts, I find that the government has failed to demonstrate that it had probable cause to institute this forfeiture proceeding. This was a young man, carrying a relatively large amount of cash, with a plausible explanation for it (Las Vegas, a new home, problems with a bank), whose identity and employment was largely confirmed (and perhaps could have been verified further by calling Mr. Jasilewicz, who not surprisingly, got nervous when faced with the prospect of law enforcement officers demanding answers. I discuss each of the factors on which the government relies individually because I find many of them deeply troubling.

### 1. *Espinola's Possession of $14,665 in Cash is Consistent with his Story*

The key factor is the defendant currency itself. As many courts have noted, the presence of large quantities of cash reasonably raises suspicions as to its origins and the intent of its holder. *U.S. v. $150,660,* 980 F.2d 1200, 1206 (8th Cir.1992). However, this Circuit and others have taken pains to make clear that money in and of itself is inadequate to establish probable cause. *$36,-634,* 103 F.3d at 1055 n. 9 (First Circuit disagrees that "Congress and the courts have implicitly created a rebuttable presumption that the possession of large amounts of cash is per se evidence of illegal activity"); *U.S. v. $121,100,* 999 F.2d 1503, 1507 (11th Cir.1993) ("We hold that a large amount of currency, in and of itself, is insufficient to establish probable cause for forfeiture under 21 U.S.C. § 881(a)(6)."); *see also U.S. v. Baro,* 15 F.3d 563, 568 (6th Cir.), *cert. denied,* 513 U.S. 912, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994) ("To date, this Court has not held that currency is contraband.")

Moreover, the amount of money here, while not insubstantial, is quite a bit less than the sums often associated with drug transactions. *See U.S. v. $191,910,* 16 F.3d 1051, 1072 (9th Cir.1994) (in contrast to a sum of $215,000 "[f]ifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity"); *U.S. v. $9,800,* 952 F.Supp. 1254, 1262 (N.D.Ill.1996) (sum of $9,800 was not sufficiently large to constitute a basis for airport seizure).

Espinola gave a credible reason for carrying the cash rather than depositing it in a bank. He told Lynch that he had had financial difficulties and was afraid that the bank might attach these funds while the dispute was resolved. There was absolutely no reason to disbelieve the story.

Many immigrants and Americans with limited means—hard working and law abiding—prefer to use cash in lieu of bank accounts and credit cards. *See, e.g., Hispanic Market Now Accounts for $235.1 Billion in Annual Spending,* American Marketplace, Feb. 8, 1996 (discussing report that demonstrates that Hispanics spend differently from non-Hispanics, paying cash for large purchases, and that many Hispanics have never used credit cards or checking accounts); Dan Kane, *Killing in Durham ends Quest for Better Life,* News & Observer (Raleigh, NC), June 30, 1997, at B1 (police state that Hispanics are targeted by robbers because "they don't use banks and they have large amounts of cash"). According to one national survey, only 31% of Hispanics in the U.S. are likely to have credit or charge cards, compared to

67% of the total population, and eight out of ten Hispanics stated that they prefer to use cash rather than charge or borrow. Paula Arrillaga, *Paying Cash, not Credit, is the Norm in McAllen,* Austin Statesman–American, Dec. 31, 1996, at D7. Indeed, the whole notion that carrying cash is indicative of illegal conduct reflects class and cultural biases that are profoundly troubling.

### 2. The Cash Purchase of the Airplane Ticket is not Suspicious in these Circumstances

My disquiet about the government's showing extends to the related variable in the probable cause equation: Espinola's purchase of his airplane ticket in cash. While many courts have found that a cash ticket purchase is a meaningful consideration in a probable cause analysis, *see, e.g., U.S. v. Sokolow,* 490 U.S. 1, 8–9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("Most business travellers . . . purchase airline tickets by credit card or check so as to have a record for tax or business purposes. . . ."), the First Circuit has noted that tickets purchased in cash are of "limited probative value" in forfeiture proceedings similar to this one. *$36,634,* 103 F.3d at 1055 n. 9; *U.S. v. $40,000,* 999 F.Supp. 234, 1998 WL 139514, at *4 (D.P.R. 1998) (finding claimant's purchase of one way ticket in cash of "extremely limited probative value"). It is wholly insufficient to establish probable cause by itself. *U.S. v. $9,800,* 952 F.Supp. at 1261.

Even accepting the validity of the government's argument as a general matter, however, it is wholly unpersuasive under the circumstances of this case. Espinola's justification for carrying the cash has the ring of credibility to it: He had trouble with his bank. Purchasing the ticket with a check or credit card may not have been an option. *See $9,800,* 952 F.Supp. at 1261 (finding purchase of ticket in cash to be common, everyday travel related activity).

Perhaps even more significant is the fact that Espinola purchased the ticket in *his own name,* largely counteracting whatever anonymity would have been provided by a cash ticket purchase. *See $40,000,* 999 F.Supp. 234, 237. I find that Espinola's purchase of the airline ticket with cash contributes virtually nothing to the government's probable cause showing.

### 3. The Use of Rubber Bands to Bind the Cash has Limited Probative Value

The argument that the money is likely linked to drug distribution because it is bound by a rubber band needs to be carefully examined. If one is carrying a large sum of cash currency, for whatever reason, using a rubber band to keep it in order is simple and effective.

I do not doubt that drug couriers and dealers use rubber bands to bundle their ill-gotten gains. However, drug dealers also presumably use belts to hold up their trousers; under the government's analysis, if Espinola was wearing a belt at the time of the seizure, it would suggest his involvement with illegal activity. Although many courts appear to disagree,[2] I find that the government's "rubber band" hypothesis doesn't stretch quite that far.[3]

### 4. Espinola's Demeanor When Stopped by the Security Guards was not Suspicious

The government next points out that the claimant was reluctant to open his briefcase when asked by the private security agent, was upset when she summoned the state police. Many courts have relied on an individual's nervous comportment when examining probable cause to forfeit, detain or arrest. *See, e.g., U.S. v. $67,220,* 957 F.2d 280, 285–86 (6th Cir.1992).

---

**2.** I know that a number of courts have disagreed, ascribing the aroma of drug crime to the use of rubber bands to bind cash. *See, e.g., U.S. v. $12,390,* 956 F.2d 801, 806 (8th Cir.1992) (finding that currency wrapped with rubber bands supported government contention that the currency was related to drug activity). I fear that this inference—linking drug trafficking to rubber bands—is yet another indication of the extent to which traditional evidentiary standards are extended to accommodate the needs of the drug war.

**3.** Even if I accept that the use of rubber bands is indicative of drug dealing, it is not sufficient to overcome the government's poor showing in other areas.

However, in these circumstances, I find that Espinola's demeanor is not particularly probative. Whatever its source, Espinola was carrying a fair amount of cash in his bag. Even if the money was obtained legally, most individuals would be reluctant about anything that drew attention to them. This is even more true where the intrusion involves a personal interaction with law enforcement officers. When Pineda called the police, Espinola faced the prospect of intrusive, suspicious and potentially lengthy questioning and searches. Being upset is not an unreasonable response, regardless of the source and intended use of the currency.

This may be particularly true where one is boarding a plane, which not only commonly aggravates one's sense of inner calm in normal conditions, *see Jones v. U.S. Drug Enforcement Administration,* 819 F.Supp. 698, 702 (M.D.Tenn.1993) (noting nervousness of air travellers generally), but which also presents the risk that a search may result in a missed flight and disrupted plans.

I also note that the prospect of interactions with law enforcement officers is often regarded with particular discomfort by members of minority groups.[4] Surveys demonstrate that many minority group members believe that the criminal justice system, particularly the police, is unfairly biased against them. *See, e.g.,* Clarence Johnson, *Racism Still Real in the Bay Area,* S.F. Chronicle, January 19, 1998, at A1 (reporting results of survey in which 43% of blacks and 26% of Latinos in San Francisco reported being treated unfairly by police or court system, compared to 3% of whites). Espinola may have suspected that his ethnicity would be a factor in the police's decision to detain him. *See, e.g.,* Carl J. Schifferle, Note, *After Wren v. United States: Applying the Equal Protection Clause to Racially Discriminatory*

*Enforcement of the Law,* 2 Mich.L. & Policy Rev. 159, 165–67 (1997) (citing several investigations and studies demonstrating that minorities are disproportionately singled out for traffic stops); *Racial Discrimination on the Beat: Extending the Racial Critique to Police Conduct,* 101 Harv.L.Rev. 1494, 1495 (1988) (most studies "reveal what many police officers freely admit: that police use race as an independently significant, if not determinative, factor in deciding whom to follow, detain, search, or arrest."); Bill Gannon, *Races Split on Rating Troopers,* Star–Ledger (Newark, NJ), May 17, 1998 (poll shows that majority of African–American drivers in New Jersey believe that they are treated worse than whites because of their race).[5]

In any case, it is significant that Espinola only appeared nervous to the *security guard,* and was not nervous, evasive or dishonest with the *police* themselves, including Lynch, the affiant. Indeed, Espinola's behavior suggests an innocent reluctance to be delayed and scrutinized rather than a fear that the police might uncover some crime.

### 5. *Espinola's Inability to Open his Briefcase adds Little to the Probable Cause Analysis*

The government also relies on the fact that neither Espinola nor his brother initially could remember the combination of Espinola's briefcase when Pineda asked them to open it. After a few moments, they managed to get it open. Given Espinola's state of mind at the time, simple forgetfulness is a reasonable explanation. Moreover, even if Espinola's short-lived unwillingness or inability to open his briefcase for the security guards is somewhat suspicious, it is of little probative value in determining whether or not the money is linked to drug transactions rather than some other illegal activity. *U.S.*

4. This discussion is predicated on the assumption that Espinola is Hispanic, the only evidence of which that I have is his name.

5. In March of 1998, the United States House of Representatives passed a bill aimed at discouraging police from using race as a factor in making stops and conducting searches. The author of the bill, John Conyers, Jr., who is African–American, stated, "There are very few of us in this country who have not been stopped at one time

for an alleged traffic violation that we thought constituted really simple racial harassment." *House Seeks Racial Breakdown on Police Traffic Stops,* L.A. Times, March 25, 1998, at A25. The bill is currently stalled in the Senate Judiciary Committee, with dim prospects of passage. Robert L. Jackson, *Traffic Stop Bias Bill Stalls in Senate; Police Groups Oppose Collection of Data on Race, Ethnicity,* Wash. Post, June 2, 1998, at A11.

*v. $30,060*, 39 F.3d 1039, 1044 (9th Cir.1994) (finding no probable cause where claimant lied about source of money, because he could have just as easily been involved in some other criminal activity as drug dealing); *U.S. v. $191,910*, 16 F.3d at 1072 ("[S]uspicions of general criminality are not enough. To obtain forfeiture under § 881, the government must have *probable cause* to believe that the money is connected specifically to *drug* activities.") (emphasis in original).

### 6. *Espinola's Story about the Source of the Money is Reasonable and was Largely Confirmed*

One of the more troubling aspects of the government's showing of probable cause relates to the credibility of Espinola's "story" regarding the source and intent of the subject cash. The fact of the matter is that ultimately Espinola's account was largely confirmed; to the extent that there were any gaps, they may be more attributable to the government's failure to pursue the leads that they had than problems with Espinola's credibility.

Lynch and the government find Espinola's explanation for the source of the cash—his relationship with Equinox International—to be unbelievable for two reasons. First, Espinola could not produce a business card or recall the phone number of the company. Second, he could not produce receipts indicating where the money came from. However, some time after the seizure, Espinola provided Lynch with documents showing that Espinola had purchased more than $5,000 worth of products from Equinox International, and the beeper number of another salesperson for the company.

As to the documents, the government asserts that they do not substantiate Espinola's claim of "earning" the money from Equinox International. As to Espinola's friend and coworker, Mike Jasilewicz, the government was unable to reach him; nothing in the record suggests that it tried.

In fact, Espinola confirmed essential parts of his story: As Lynch himself pointed out,

Equinox International is a Las Vegas-based company that produces personal care products that are sold to salespersons. The salespersons resell the products to consumers, presumably door to door. Espinola provided documentation showing that he purchased $5,000 worth of Equinox International's products in the last year. We can assume that he resold them to the public. The following conclusions can be drawn:

a. It is not unreasonable that Espinola was not carrying a "business card" showing that he was an employee of Equinox International at the time. He was more of an independent salesman rather than an employee of Equinox International in the traditional sense. He purchased the materials from Equinox International, and then was responsible for reselling them himself. This is a non-traditional employee relationship for which a business card should not be assumed.

b. It is not unreasonable for Espinola to have problems remembering the telephone number of the organization. Given the nature of the employment relationship, it is quite likely that he did not have an office at Equinox, or even a direct supervisor. Rather, it appears that he purchased their products, possibly even through mail order, and then sold them on his own time and from his own residence.

c. Espinola's documentation of $5,000 in purchases provides a credible explanation for his possession of a large amount of cash. If, indeed, he sold the products door to door, or its equivalent, he could have accumulated a large amount of cash from a wide array of different sources.[6] *See U.S. v. $9,800*, 952 F.Supp. at 1262 (no probable cause where amount of cash carried by claimant was "not grossly incommensurate with his purported income"). Moreover, Espinola's assertion that he was in financial difficulty and was afraid that a bank might attach his earnings if he put them in a checking account provides a credible explanation for his decision to keep the money in cash.

---

**6.** Moreover, Espinola asserted to Lynch that the money was made by him and his brother, who

was travelling with him at the time.

d. If Espinola sold the products door to door, it is wholly unlikely that he would have documentation for each individual sale as the government seems to expect. Rather, given the nature of Equinox International's business and Espinola's documentation of his purchases, his possession of cash without more documentation is quite reasonable. He bought $5,000 worth of product, and was carrying $15,000. Under these circumstances, I find that the documentation that Espinola produced is sufficient to corroborate the story he told Lynch in the airport.

e. As will be discussed in greater detail below, the process by which Espinola appears to have made the money substantially increases the likelihood that some of it would be contaminated with narcotics residue, and consequently result in a positive alert by Alf, the narcotics dog.

f. Finally, the fact that the company is headquartered in Las Vegas supports Espinola's assertion that he decided to move there. He appears to have visited the city in the past year at least once, and had a reasonably successful business relationship with Equinox there.

### 7. Espinola's Las Vegas Plans were Plausible

The next issue concerns the story Espinola told Lynch about what he intended to do with the money: put a down payment on a house in Las Vegas, a decision he had only made with certainty the night before. The government asserts that the story is not credible because of the rapid timing of Espinola's decision and because he did not remember the name of the realtor with whom he was dealing.

Again, I disagree. Courts have the authority in a proceeding such as this, of course, to determine whether someone's explanation is credible or not. *$36,634*, 103 F.3d at 1055 (finding that probable cause was bolstered by claimant's nonsensical explanation that he was going to Las Vegas to gamble and buy a pizza store, as his ticket only provided a brief layover there in the middle of the night). Moreover, it is true that a typical middle-class homebuyer does not jump on a plane, with a ticket purchased in cash that morning, in order to put a cash down payment on a house almost three thousand miles away.

Yet the government's suggestion that Espinola's rights to his property are at risk simply because he did not conform to majority norms is troubling, to say the least. Espinola was approximately twenty-three years old at the time of the seizure; he earned his living by selling personal care products that he purchased from a distant company. It is not incredible that someone in his position, young and possibly with limited roots in the area, would make a sudden decision to buy a plane ticket and look for a house in a different state. A young man in Espinola's position should not be presumed to be doing something wrong just because he did not go about it the same way that a lawyer or government official might have.[7]

### 8. The Positive Alert by the Narcotics Dog, even if Credited, adds Little in these Circumstances

Last, I turn to the "sniff" test performed by Alf, the narcotics detection dog at the state police barracks. As noted above, the police took pains to bolster the credibility of the test by placing shredded, out-of-circulation currency in identical envelopes before Alf, at the same time as the subject currency. Alf only alerted to the subject currency. Despite this effort, I still find the presence of narcotics on the money to be weakly probative of the money's link to a drug transaction.

As a threshold matter, a positive alert to the presence of narcotics, standing alone, is insufficient to establish probable cause. *See, e.g., $9,800*, 952 F.Supp. at 1261 ("the government must come forward with more than a 'drug courier profile' and a positive dog sniff ..."); *U.S. v. $80,760*, 781 F.Supp. 462, 476 (N.D.Tex.1991), *aff'd*, 978 F.2d 709 (5th Cir. 1992) (dog sniff insufficient to establish prob-

---

7. Moreover, the fact that Espinola could not remember immediately the name of the realtor with whom he was dealing is probative of nothing. Given Espinola's age, employment circumstances, and the amount of money he was carrying, it is likely that his future residence would be quite modest, and thus it is entirely supposable that no realtor was involved at all.

able cause); *U.S. v. $40,000*, 999 F.Supp. 234, 1998 WL 139514 at *4 (same).

Moreover, a great many courts have aggressively questioned the probative value of positive "dog sniffs" on currency altogether.[8] *See, e.g., U.S. v. $5,000*, 40 F.3d 846, 849–50 (6th Cir.1994) (citing number of studies showing that vast majority of U.S. currency is contaminated with drug residue and quoting law enforcement officers questioning relevance of dog sniff tests); *$30,060*, 39 F.3d at 1041–43 (citing numerous cases and studies challenging probative value of canine alerts); *U.S. v. $639,558*, 955 F.2d 712, 714 n. 2 (D.C.Cir.1992) (referring to scientific testimony that 90% of all cash in the United States contains sufficient quantities of cocaine to alert a narcotics detection dog); *Jones*, 819 F.Supp. at 719–21 ("the continued reliance of courts and law enforcement officers on dog sniffs to separate 'legitimate' currency from 'drug-connected' currency is logically indefensible"). The positive alert *is* probative in demonstrating that the subject currency had at some point been in contact with drugs. However, these tests tell us very little about whether the currency was actually exchanged for or intended to be exchanged for drugs by the claimant.

The fact that Alf did not alert to the shredded currency cannot be considered particularly weighty in light of the lack of information before us. How old is the out-of-circulation currency? How long does it take for narcotics residue to wear off?[9] Does the shredding process in any way "cleanse" the out-of-circulation currency of suspect residues? We simply do not have enough information before us to credit the police's com-

parative test with any value in the probable cause equation.

Finally, the apparent source of the money—numerous small retail sales of consumer products—substantially increases the likelihood that Espinola had no connection to any drug activity, even if some of his currency was in fact tainted with drug residue in the recent past. If Espinola sold $15,000 worth of Equinox International products in a door to door manner or something like it, it is not surprising that one or more of the bills of currency that he collected would contain some sort of residue. Thus, given the source of the money, the positive alert for the presence of narcotics is even less probative. *See* Debbie M. Price, *Use of Drug–Sniffing Dogs Challenged: ACLU Backs Complaint by Men Whose Pocket Cash was Seized,* Wash. Post, May 6, 1990, at D1, D6 ("a single bill used to snort cocaine or mingled with the drug during a transaction can contaminate an entire cash drawer"), *cited in $30,060*, 39 F.3d at 1042. Indeed, this is true even if I fully credit the government's assertion that detection dogs only alert to a substance that indicates recent contact with drugs.

In sum, I find that Alf's positive alert for the presence of narcotics on the subject currency contributes very little to the probable cause equation in this case. Not only is it a science with shaky foundations, but in the context of this case, says little about the link between the *res* and illegal drug transactions.

**9. Claimant was never Arrested or Convicted in Connection with these Circumstances, nor does he have a Criminal Record**

There has been no arrest, conviction, charge or any other procedure linking this

---

**8.** At the Court's request, the government submitted information regarding the reliability of such dog sniff tests, namely a report and a chemist's declaration. While the government's information supports the credibility of such tests, I note the following: first, even the authors of the report indicate that studies on the topic are few and knowledge remains limited, which suggests that the *scientific probity of dog testing has yet to* be determined with anything approaching finality. Second, as I explain below, in light of Espinola's explanation for the source of the money—from a large number of different people—it would still be possible for Espinola to carry innocently some small quantity of currency that had been contaminated by one of his customers.

**9.** Indeed, the government has presented information that dogs like Alf alert not to the presence of cocaine itself, but to methyl benzoate, a chemical used in the manufacture of street cocaine. According to the declaration of Dr. Furton, an expert in the field of analytical chemistry and forensic science, methyl benzoate is a highly volatile substance that dissipates quickly when handled or exposed to air. If so, one can expect that the expired currency, even if it would have tested positive some time in the past, was functionally "clean" of all residues that would be of interest to a canine investigator.

money or the claimant in any way with an actual crime. While I am aware that this is not necessary in order for the government to prevail in a forfeiture proceeding, it is certainly part of the data which frames probable cause. *See, e.g., U.S. v. $250,000,* 808 F.2d at 898–99 (probable cause based in part on fact that claimant was arrested and convicted for distribution of cocaine, and admitted to federal agents that he earned substantial amounts of money during a ten year career in cocaine and heroin dealing). In many currency forfeiture cases, the individual carrying the money also carried drugs, weapons, drug paraphernalia or the like. *See, e.g., U.S. v. Parcels of Land,* 903 F.2d 36, 40–41 (1st Cir.1990) (search of claimant's residence uncovered fourteen pounds of marijuana, several guns, and a triple beam weighing scale). No such circumstances, which would have bolstered the government's flaccid showing of probable cause, exist here.

Similarly, Espinola has no criminal record of any kind for drug activity, nor for that matter any criminal record at all. *See $121,-100,* 999 F.2d at 1507 (finding claimant's extensive history of narcotics arrests and convictions a critical factor in probable cause analysis).

Moreover, the government has not shown that Espinola was doing business or had personal relationships with drug dealers or that he was even near a location associated with illegal drugs. Many courts have relied on this kind of information in the probable cause analysis. *See, e.g., $36,634,* 103 F.3d at 1054–55 (listing claimant's association with accused drug traffickers, and unexplained, out-of-the-way stop at their place of business, in probable cause analysis); *Parcels of Land,* 903 F.2d at 40 (probable cause bolstered by evidence that claimant of seized property ran a drug business with various partners); *$40,-000,* 999 F.Supp. 234, 237 (no probable cause where government unable to link claimant to any drug transaction, organization or known dealers).

### 10. *Claimant was not Dishonest with the Police*

Espinola at no point gave a false name or identification to the police; nor have the police established that he was anything but completely honest during their interview. *$36,634,* 103 F.3d at 1054–55 (listing evasive, implausible and false answers in probable cause analysis); *U.S. v. $53,082,* 985 F.2d at 250 ("false or evasive statements to police officers indicate possible criminal activity"); *U.S. v. $30,060,* 39 F.3d at 1045 (no probable cause to forfeit even where claimant lied about source of money); *U.S. v.. $9,800,* 952 F.Supp. at 1261–62 (fact that claimant did not use an alias, volunteered information to the police, and gave honest answers undermined government showing of probable cause). While the police and the government question the plausibility of Espinola's story, they have not made any attempt to demonstrate that it was false. *See, e.g., U.S. v. $15,100,* 1994 WL 240516, at *3 (N.D.Ill.1994) (government showed that claimant's story about intended use of currency was false by demonstrating that there was no business by the name given by claimant during questioning by police). Moreover, contrary to the government's assertions, there was nothing evasive or inconsistent about Espinola's story. *$40,000,* 999 F.Supp. 234, 236. I believe that the utter absence of any prevarications or falsehoods deeply undermines the government's showing of probable cause.

### 11. *The Length of Espinola's Stay in Las Vegas Supports his Story*

The length of Espinola's trip is entirely plausible and supports his stated reason for flying to Las Vegas, further skewing the probable cause balance. Espinola planned to stay in Las Vegas for four days, which is considerably longer than many of the instances where a drug courier or dealer is making a trip for a nefarious end. A lengthy and otherwise unexplained round trip to some distant city that only lasts a day or so may be suspicious in some cases. *See, e.g., Sokolow,* 490 U.S. at 8–9, 109 S.Ct. 1581 (suspect flew from Honolulu to Miami, a twenty hour flight, for a stay of only 48 hours). In contrast, a four day trip to Las Vegas is, I suspect, rather longer than average. *See U.S. v. $9,800,* 952 F.Supp. at 1262 (finding that ten day stay in El Paso militated against a finding of probable cause). Moreover, it is consistent with Espinola's

explanation that he intended to look for a home.

## IV. *CONCLUSION*

Looking at the cases involving civil forfeiture under the drug laws, it is clear that the government's showing of probable cause is completely inadequate. It is true that the aggregation of facts, each of which is insufficient alone, may suffice to meet the government's burden of showing probable cause. *U.S. v. $83,310.78,* 851 F.2d 1231, 1235 (9th Cir.1988). However, the factual predicates offered by the government are inadequate both individually and under a "totality of the circumstances" test. *Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *$36,634,* 103 F.3d at 1054 (describing probable cause as a wall, with each piece of evidence representing a brick).

Our nation's drug forfeiture system is drawing increasing and exceedingly sharp criticism from scholars and commentators. *See, e .g.,* Eric Blumenson & Eva Nilsen, *Policing for Profit: The Drug War's Hidden Economic Agenda,* 65 U.Chi.L.Rev. 35 (1998) (discussing threat to civil liberties and effective law enforcement by forfeiture-financed "war on drugs"); Marc B. Stahl, *Asset Forfeiture, Burdens of Proof and the War on Drugs,* 83 J.Crim.L. & Criminology 274 (1992) (arguing that asset forfeiture laws violate the due process clause); Dee J. Hall, *The Abuses of Property Forfeiture Law: What to do with Money from Sale of Drug Dealers' Assets?,* Wisc. State Journal, June 21, 1998, at 1A; James Bovard, *The Dangerous Expansion of Forfeiture Laws,* Wall St. J., Dec. 29, 1997, at A11. Where the government seeks to forfeit a person's money under such tenuous circumstances as these, I am obliged to add my voice to this growing chorus of dissent.

**SO ORDERED.**