**UNITED STATES of America, Plaintiff,**

v.

**$12,840 IN UNITED STATES CURRENCY, Defendant.**

**Jaime H. Martinez, Claimant.**

**Civil Action No. 05–12329–NMG.**

United States District Court, D. Massachusetts.

Sept. 21, 2007.

Kristina E. Barclay, U.S. Attorney's Office, Boston, MA, for Plaintiff.

Joseph Michael Majchrzak, Price & Majchrzak, Chelsea, MA, for Claimant.

### MEMORANDUM & ORDER

GORTON, District Judge.

This is a civil forfeiture proceeding in which the government seeks to confiscate from an individual $12,840 in cash found in the trunk of his car during a traffic stop.

## I. *Background*

### A. Procedural History

On November 21, 2005, the government filed a civil complaint for forfeiture *in rem* against the subject property. On May 9, 2006, the claimant, Jaime Humberto Martinez, filed a motion for summary judgment and/or to dismiss the forfeiture complaint. Two weeks later the government filed its opposition to that motion and a motion for discovery pursuant to Fed. R.Civ.P. 56(f).

On January 4, 2007, the Court allowed the government's motion for discovery, denied the claimant's motion for summary judgment without prejudice to its being renewed upon completion of discovery and set a Rule 56(f) discovery deadline of March 16, 2007. In May, 2007, after the expiration of the discovery deadline, claimant's counsel informed the deputy clerk that the government had not pursued any discovery and that he intended to renew his motion for summary judgment and/or to dismiss the complaint by relying on his previously filed papers. The government having failed to conduct discovery as authorized and the docket having been dormant for almost nine months, the Court will construe the defendant's prior motion as renewed and resolve that motion as follows.

### B. Factual Background

The following facts are derived from the affidavit of James J. Picardi ("Officer Picardi"), a Task Force Agent ("TFA") with the United States Drug Enforcement Administration ("DEA") and a member of the Revere Police Department. The affidavit

was submitted as an exhibit to the complaint in this case.

On Wednesday, June 8, 2004, at approximately 8:45 p.m., Revere Police Officers John Chann ("Officer Chann") and Mark Desimone ("Officer Desimone") were operating a marked Revere Police cruiser in full uniform. While sitting at a red light, the officers observed an automobile make an illegal left turn from Route 1A onto Beach Street in Revere. The officers activated the siren and attempted to stop the vehicle. The vehicle initially kept moving but eventually pulled over after several verbal commands from the cruiser.

The officers approached the vehicle and identified the driver as the claimant, Jaime Martinez ("Martinez")[1]. When they relayed his information to dispatch, the officers learned that Martinez had a suspended driver's license and an outstanding warrant for his arrest for operating after suspension. The officers then asked Martinez to get out of the car and advised him that he was being placed under arrest on the outstanding warrant and for operating after suspension. Martinez was given his *Miranda* warnings. The vehicle was parked in an unsafe location in front of a fire hydrant. The female passenger, who identified herself as Mirna Granados, informed the officers that she did not have a driver's license and could not, therefore, move the vehicle. The officers allowed Martinez, the owner of the vehicle, to attempt to contact someone on his cell phone to move the car but was unable to locate anyone after ten minutes, at which time the officers arranged for the car to be towed.

The officers placed Martinez in handcuffs, searched him and escorted him into the cruiser and then began to conduct an inventory search of the vehicle pursuant to the Revere Police Department's tow policy. As Officer Desimone was conducting the inventory search, Martinez started to "yell" to Granados in Spanish. Until that point, Martinez had been speaking fluent English with both officers. The tow truck officer, who had arrived on the scene and evidently understood Spanish, informed the officers that Martinez had said "get the bag, get the bag" to Granados.

After Martinez had yelled to Granados, she attempted to remove a backpack from the trunk of the vehicle. Officer Desimone stopped her because the bag was in the vehicle and needed to be inventoried. Officer Desimone opened the bag and discovered the subject cash "strewn" inside. He asked Martinez about the cash and was told it derived from several years' worth of tax returns. Martinez said he was going to the bank with it but, according to the affidavit, "the bank was closed". Martinez then stated that the money was for a down payment on a house.

Officer Desimone asked Martinez how much money was in the bag and Martinez responded, "I don't know". Seconds later, Martinez stated "around sixteen or fifteen thousand". According to the affidavit, Martinez then became more "nervous and evasive". Because of the large amount of cash, Martinez' nervous behavior and his inconsistent answers about his intended use for the money, the officers called a Massachusetts State Police K–9 Unit to meet them at the police station to conduct a drug sniff.

The officers then transported Martinez to the Revere Police Station where he was booked and again given his *Miranda* warnings in both English and Spanish.

1. In the course of the investigation, the officers determined that Martinez used several names, including Jaime Martinez, Jaime Martines, Jamie Martines, Jamie Humerto Martines, Armando Gutierrez–Aguilar and Jamie Santiago Martinez, Jr.

Lieutenant Dave Callahan (apparently a member of the Revere Police Department) questioned Martinez about the money and Martinez responded that he was buying a car and that it was from an old tax refund. Lieutenant Callahan asked Martinez again why he had so much money and Martinez stated that it was a down payment for a house. Martinez could not, however, provide the location of the house or name the mortgagee bank. Martinez could not say how much money was in the bag but again estimated around $15,000 or $16,000 and could not explain why he had told conflicting stories about the money.

Eventually, Massachusetts State Police ("MSP") Trooper Gary Mozuch ("Trooper Mozuch") arrived at the station with a drug-sniffing dog. Tropper Mozuch took the backpack containing the currency and placed it in an empty desk drawer in the garage of the Revere Police Station. He then released the dog and let him roam the garage, an area of approximately 800 square feet. The dog sniffed around and then went to the desk drawer and began to bark. Trooper Mozuch opened the drawer and the dog removed the backpack and again began to bark. According to Trooper Mozuch, the dog's reaction to the bag containing the cash indicated the presence of a narcotic odor.

Later that evening, the officers counted the cash and determined that it was comprised of $12,840 in United States currency. The cash was placed in a sealed evidence envelope. On June 24, 2005, Sergeant Thomas Malone and the affiant, Officer Picardi, transported the currency to a bank where it was exchanged for a check which was handed over to Officer Picardi.

## II. *Legal Analysis*

As an initial matter, the Court notes that it is not illegal in the United States to possess cash. Furthermore, to the best of the Court's knowledge, the claimant in this case has not been charged with any drug-related offense arising out of his arrest on June 8, 2004.

### A. Standard

Pursuant to 21 U.S.C. § 881(a)(6), any moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 18 U.S.C. §§ 841 and/or 846, and all proceeds traceable to such an exchange, are subject to forfeiture by the United States. No property shall, however, be forfeited by reason of any unintentional act or omission on the part of the owner of such property.

In a judicial forfeiture proceeding, the government may commence an action in rem directly against the forfeitable property. The standard for pleading in such a proceeding is governed by Rule E(2)(a) of the Supplement Rules for Certain Admiralty and Maritime Claims. *See United States v. Lopez–Burgos,* 435 F.3d 1, 2 (1st Cir.2006). Prior to the passage of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the government had the burden of establishing "probable cause" in the complaint that the property was forfeitable. *See Lopez–Burgos,* 435 F.3d at 2. Under Rule E(2)(a) as implemented by CAFRA, however, the government's burden is defined as follows:

> In actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading.

Post–CAFRA, numerous courts have interpreted Rule E(2)(a) to require the gov-

ernment to establish "reasonable belief" that the property is subject to forfeiture. *See, e.g., United States v. Mondragon,* 313 F.3d 862 (4th Cir.2002); *United States v. $49,000 in U.S. Currency,* 330 F.3d 371 (5th Cir.2003) (dicta); *United States v. All Funds on Deposit at Dime Sav. Bank,* 255 F.Supp.2d 56 (E.D.N.Y.2003). The government incorrectly states that the First Circuit Court of Appeals had adopted the "reasonable belief" standard prior to the enactment of CAFRA, *see United States v. Pole No. 3172, Hopkinton,* 852 F.2d 636, 638 (1st Cir.1988), but the Court subsequently clarified that under the pre-CAF-RA pleading standard, the government was required to allege facts sufficient to support a reasonable belief that the government could demonstrate "probable cause" at trial. *United States v. One Parcel of Real Property,* 921 F.2d 370, 376 (1st Cir.1990). In short, a reasonable reading of the statute and the case law reveals that CAFRA has lowered the pleading standard from one of "probable cause" to one of "reasonable belief".

Under CAFRA, no civil forfeiture complaint may be dismissed because the government lacked sufficient evidence of forfeit-ability at the time of filing, *see* 18 U.S.C. § 983(a)(3)(D), and the government may use evidence gathered after filing to meet its burden of proof at trial, *see* 18 U.S.C. § 983(c)(2). CAFRA does, however, raise the government's burden at trial from probable cause to a preponderance of the evidence. *See* 18 U.S.C. § 983(c)(1); *Lopez–Burgos,* 435 F.3d at 2. If the government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the government shall establish that there was a "substantial connection" between the property and the offense. 18 U.S.C. § 983(c)(3).

## B. Application

Under CAFRA, the question is whether the facts alleged by the government are sufficient to demonstrate a reasonable belief that the property is subject to forfeiture and whether the claimant can frame a responsive pleading without moving for a more definite statement.

The only evidence proffered by the government connecting the subject property to an illegal drug transaction in this case is the fact that a drug-sniffing dog barked at a bag containing cash in the garage at the Revere Police Department. The government does not allege, and the record lacks any support for, a finding that the claimant was on his way to or from a drug transaction.

### 1. Reliability of canine drug sniff

The defendant has cited numerous cases in which the evidentiary value of an alert by a drug-sniffing dog has been called into doubt. For example, expert testimony has been offered in other cases suggesting that between 70 and 97 percent of all bills in circulation in this country are contaminated by cocaine. *See United States v. $639,558 in U.S. Currency,* 955 F.2d 712, 714 n. 2 (D.C.Cir.1992); *United States v. $53,082 in U.S. Currency,* 985 F.2d 245, 250–51 n. 5 (6th Cir.1993).

Courts have also observed, on the basis of expert testimony, that as many as one in three circulating bills have been involved in a cocaine transaction. *See United States v. $639,558,* 955 F.2d at 714 n. 2. Cocaine and other drugs attach to the oily surface of currency and as each bill passes through cash registers, wallets and counting machines, trace amounts of drugs pass to other bills. *See United States v. U.S. Currency, $30,060,* 39 F.3d 1039, 1042–43 (9th Cir.1994). If, in fact, such a large percentage of bills are contaminated with

drugs, then an alert by a drug-sniffing dog that a bundle of bills is contaminated is of limited probative value.

Supposing in this case that some of the cash was contaminated, the defendant argues that a trace amount of drugs on even a few bills would be enough to cause the dog to alert and given the high percentage of contaminated bills in circulation in the United States, the dog's alert does not, standing alone, establish that the subject cash was necessarily involved in a drug transaction.

In opposition, the government contends that the cases cited by the defendant are outdated and that recently, courts have accepted more accurate scientific testimony establishing the reliability of a positive dog alert as evidence that bills have been recently contaminated with illegal drugs. *See United States v. $30,670 in U.S. Funds*, 403 F.3d 448, 457–59 (7th Cir.2005) ("a properly trained dog's alert to currency should be entitled to probative weight" and finding older cases depreciating value of the dog alert to be unpersuasive). In addition, the government cites scientific evidence which demonstrates that a properly trained drug dog alerts to the presence of methyl benzoate, a chemical used in cocaine production, and not to cocaine itself, and because methyl benzoate evaporates quickly its presence on currency indicates that the currency has been in recent close proximity to processed cocaine. *See United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir.2001).

While it is not the role of this Court at this stage in the litigation to determine the authenticity of two competing sets of scientific theories, the fact remains that the only evidence connecting the cash in this case to a drug transaction is the barking of a dog which is, at best, of limited value. The Court considers the drug alert as just one factor among several in determining whether, under the totality of the circumstances, the government has met its burden of establishing that a reasonable suspicion exists that the confiscated property was related to an illegal drug transaction. *See United States v. One Lot of U.S. Currency Totalling $14,665*, 33 F.Supp.2d 47, 51 (D.Mass.1998).

## 2. Whether facts of this case, in totality, rise to reasonable suspicion

The government makes no any allegations connecting the claimant with drug trafficking, nor does it suggest that the claimant was operating a vehicle in a high-crime area or that he has any known connection to drug dealers. Apart from the dog alert, no other evidence indicative of drug possession, such as drug paraphernalia or a firearm, was found in his car. Under Rule E(2)(a) of the Supplement Rules for Certain Admiralty and Maritime Claims, the government is required to make allegations that are specific enough such that the claimant can frame a responsive pleading without the need for a more definite statement. Here, the claimant cannot reasonably frame a responsive pleading or a defense where the government alleges no connection with the drug trade other than a positive drug alert.

The actions of the claimant in this case do not establish reasonable suspicion that the subject money was related to a drug transaction. Martinez allegedly asked his companion, Granados, to "get the bag" out of the trunk in Spanish, but it was not unreasonable for him to want to remove the cash from his car before watching it be towed away. That Martinez appeared "nervous" and told inconsistent stories regarding his intended use of the money similarly fail to create reasonable suspicion that he had bought or sold drugs because any rational person might be nervous when placed under arrest.

The police found Martinez' inconsistent statements with respect to his intended use for the money to be suspicious but the fact that he alternately told police the money was intended for a new car, or for a down payment on a house, or for deposit in a bank is not indicative of criminal activity. Notably, Martinez made consistent statements with respect to the source of the money, telling the officers repeatedly that it resulted from an old tax return.

Furthermore, unlike other cases cited by the government in which money was found neatly stacked in bundles and bound with rubber bands or sealed in plastic bags (which is, supposedly, consistent with the manner in which cash is handled in the drug trade), the cash in this case was discovered "strewn" about inside a backpack. *See, e.g., United States v. Mondragon,* 313 F.3d 862, 864 (4th Cir.2002) ($500,000 in cash found in professional-grade hidden compartment of an automobile sealed in 15 plastic bags, consistent with practice in the drug trade); *United States v. $49,000 Currency,* 330 F.3d 371, 373 (5th Cir.2003) (cash found inside garment bag divided into seven bundles, each bearing a small piece of paper denoting the amount, as is common in the drug trade); *United States v. Funds in Amount of $30,670,* 403 F.3d 448, 450 (7th Cir.2005) (money found in a garment bag and stuffed in claimant's clothes in bundles wrapped in rubber bands). By comparison, the manner in which Martinez was found to transport cash is inconsistent with its use in the drug trade.

Moreover, unlike other cases in which the dog was presented with several bags of money and alerted on the suspected currency from among that group, *see United States v. One Lot of U.S. Currency Totalling $14,665,* 33 F.Supp.2d 47, 51 (D.Mass. 1998), in this case the dog had no options, albeit he discovered the bag inside a desk drawer in a large room. That fact undermines the reliability of the drug alert as the government's sole evidence of illegal narcotic activity in this case.

While the complaint may not be dismissed for lack of evidence at the time of filing, *see* 18 U.S.C. § 983(a)(3)(D), and the government may gather additional evidence after filing for use at trial, *see* 18 U.S.C. § 983(c)(2), the government here has failed to complete discovery, which it requested pursuant to Fed.R.Civ.P. 56(f), within the time frame prescribed by this Court and has, therefore, waived its opportunity to gather additional evidence from or against the defendant. Moreover, the government admits that it has already disposed of a key piece of evidence, i.e. by exchanging the actual cash seized during the stop for a bank check. Rather than retain the cash in an evidence locker for subsequent testing or for use as evidence at trial, which would have been the prudent procedural course of action in a criminal case, the police conduct in this case suggests a lack of confidence in establishing reasonable suspicion.

The claimant was stopped for having made an illegal turn but has not been charged with a drug-related crime arising out of that incident. The government seized $12,840 in cash and ultimately deposited it in a bank without reasonable suspicion. The claimant's motion for summary judgment and/or to dismiss the complaint will be allowed and the case will be dismissed. The subject property shall be returned to the claimant.

## ORDER

The claimant's motion for summary judgment and/or to dismiss the complaint (Docket No. 7), which the Court construes as having been renewed, is **ALLOWED.** Judgment will be entered in favor of the claimant, the case is **DISMISSED** and the

subject property shall be returned to the claimant.

**So ordered.**