[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 2, 2004
THOMAS K. KAHN
CLERK

_____

No. 01-16485

_____

D. C. Docket No. 99-01259-CV-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

$242,484.00,

Defendant,

DEBORAH STANFORD, individually and as
President, Director, and Stockholder of
Mike's Import & Exports, U.S.A., a
Florida corporation,

Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 2, 2004)

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON, and PRYOR, Circuit Judges.

CARNES, Circuit Judge:

This appeal arises out of a civil forfeiture action involving money linked to illegal drug activities. After the district court ordered the forfeiture of $242,484.00 in cash that had been seized from the claimant, Deborah Stanford, a panel of this Court reversed and directed the district court to order the cash returned to her. We granted en banc rehearing to consider two issues raised by the case. One issue concerns the way this Court views district court findings, particularly implicit findings, and the other involves the meaning of probable cause.

This case arose under 21 U.S.C. § 881(a)(6) (1994), a version of the Comprehensive Drug Abuse Prevention and Control Act which is no longer in effect. Under the version of the forfeiture statute that superceded it and applies to cases arising on or after August 23, 2000, probable cause is no longer a central issue in forfeiture proceedings. Nonetheless, we thought the probable cause issue in this case important enough for en banc review because of its implications for search and seizure cases. And our discussion about how an appellate court should view the record and a district court's findings of fact applies to all appeals in which the district court has made explicit or implicit findings.

2

# I.

The United States filed a complaint for civil forfeiture of $242,484.00 in cash seized by Drug Enforcement Agency agents from Deborah Stanford after she arrived at the Miami airport following a flight from New York on December 14, 1998. At Stanford's suggestion, the parties waived any right to a jury trial and the district court heard all of the evidence, including the testimony of a number of law enforcement officers and agents.

After the government rested on the probable cause issue, and Stanford declined to offer any evidence on that aspect of the case, the district court made what it described as a "preliminary" finding that the government had satisfied its burden of showing probable cause to believe that the $242,484.00 in cash was the proceeds of, or was otherwise connected to, illegal drugs. See generally United States v. Carrell, 252 F.3d 1193, 1201-02 (11th Cir. 2001). As a result of that finding, the burden shifted to Stanford to establish by a preponderance of the evidence one of two affirmative defenses: either that the money was not the proceeds of illegal drug activity, or that she was an innocent owner. See id. at 1201 (explaining the applicable procedure); United States v. 15603 85th Ave. N., 933 F.2d 976, 979 (11th Cir. 1991) (same). Stanford has never claimed to be the

3

true owner of the money, only the legal possessor, and the owner has never come forward to claim the money.

Stanford herself was her only witness at trial, and she attempted through her testimony to persuade the district court that the $242,484.00 in cash she was carrying was not connected to illegal drug activity. The court was not persuaded. After hearing all of the evidence, the district court issued an opinion explaining how it concluded based upon the totality of the circumstances that the government had established probable cause to believe that the $242,484.00 Stanford was carrying was substantially connected to an illegal drug transaction. The opinion also explained that Stanford had not thereafter satisfied her burden of proving by a preponderance of the evidence "that the money at issue was not in fact the proceeds of an illegal narcotics transaction." Because Stanford did not offer any evidence to support an innocent owner defense, the court also found that she had failed to carry her burden of establishing that defense. The district court entered a final judgment in favor of the government and against the defendant property, the $242,484.00. Stanford appealed.

A panel of this Court reversed, holding that probable cause had not been established and that, as a result, the $242,484.00 in cash must be returned to Stanford. United States v. $242,484.00, 318 F.3d 1240, 1242 (11th Cir. 2003),

4

<u>withdrawn by panel and reissued as amended by</u> No. 01-16485, slip op. 2881 (11th Cir. June 30, 2003), <u>withdrawn by panel and reissued as amended by</u> 351 F.3d 499 (11th Cir. 2003). We granted rehearing en banc, an action which vacated the existing panel opinion. <u>United States v. $242,484.00</u>, 357 F.3d 1225 (11th Cir. 2004).

## II.

Necessarily antecedent to any decision of whether the facts establish probable cause is a determination of what the facts are. For that reason, we first address the fact finding issue. It involves the testimony of one of the DEA agents that, while being questioned about the cash she was carrying, Stanford changed her story. According to the agent, Stanford first said that she had gone to New York City in connection with a court case involving a ten-year old traffic accident, and while there she received a telephone call from her brother asking her to pick up some cash for their business in Miami. The agent testified that following additional questioning, and after a drug-detecting dog had alerted to Stanford's backpack containing the cash, she changed her story and told the agents that she had gone to New York City for the specific purpose of picking up the cash.

After a brief introductory paragraph, the district court's memorandum opinion begins with a section labeled "Facts," the first sentence of which is: "The

5

facts of this case are as follows." That section consists of nine paragraphs and eight footnotes, the last of which describes how questioning of Stanford resumed after the drug dog had alerted on her backpack containing the cash. There the district court says:

> At trial, Agent Miles stated that at this point, Ms. Stanford had changed her story concerning the source of the money. Agent Miles testified that originally Ms. Stanford said that she was in New York for the court case, and then later in the interview switched to claiming that she was in New York specifically to pick up the money in question.

Shortly (six sentences in the main body of the text) thereafter, the "Facts" section of the memorandum opinion ends with the district court's explanation that: "It is upon the above-related facts that the Court bases its decision."

Those written findings came after the court had made oral findings and a ruling immediately upon the conclusion of testimony at the probable cause stage of the trial. In its oral findings, while discussing the many facts that supported probable cause, the district court, referring to what Stanford had told the agents, noted as a fact "the inconsistencies her explanation offered." Not only that but the court also specifically found that one of the "primary factors" weighing in favor of probable cause was "the inconsistent statements by Ms. Stanford as to . . . how she came to be carrying [the cash]."

6

Notwithstanding that, Stanford insists the district court did not actually find that she changed her story, but instead in its written findings merely described Agent Miles' testimony that she had done so. In reviewing the district court's probable cause determination, Stanford says that we must accept as a fact that she did not change her story. In other words, she would have us construe the district court's description of the agent's testimony, the truth of which would support the district court's conclusion and judgment, as a finding by the court that the testimony is false. Stanford's position has things upside down.

A bedrock principle upon which our appellate review has relied is that the "appeal is not from the opinion of the district court but from its judgment." Gilbert v. Sterrett, 509 F.2d 1389, 1393 (5th Cir. 1975).[1] We have seen it as "our duty . . . to view the testimony and inferences therefrom in the light most favorable to the prevailing party below." Daniel v. United States, 234 F.2d 102, 106 (5th Cir. 1956); see also United States v. Goddard, 312 F.3d 1360, 1362 (11th Cir. 2002) ("The facts are construed in the light most favorable to the prevailing party."); United States v. Robinson, 62 F.3d 1325, 1331 n.11 (11th Cir. 1995) ("Our review standard requires us to view the evidence in the light most favorable to the

---

[1] Decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in this circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

7

prevailing party . . . ."); <u>United States v. Cure</u>, 996 F.2d 1136, 1138 (11th Cir.

1993) ("[T]his court must construe the facts in the light most favorable to the

prevailing party. Moreover, appellant must show that the district court clearly

erred in its findings of fact."); <u>Dillon v. M.S. Oriental Inventor</u>, 426 F.2d 977, 978

(5th Cir. 1970) ("In the absence of clear error, the evidence must be viewed in the

light most favorable to the party who prevailed below."); <u>Alcott Co. v. Raphael</u>,

275 F.2d 551, 552 (5th Cir. 1960) ("Stating the facts most strongly in favor of the

appellee, as we must on an appeal from a finding of facts . . . .").[2]

---

[2] Stanford argues that <u>United States v. Butler</u>, 41 F.3d 1435 (11th Cir. 1995), conflicts with the decisions we just cited. It does not. The <u>Butler</u> Court merely held that wholesale adoption of the part of a pre-sentence investigation report containing the government's contentions, to which the defendants had objected, did not constitute the type of individualized fact finding required in determining under the sentencing guidelines the amount of criminal conduct foreseeable to each defendant. <u>Id.</u> at 1443, 1446-47 ("A contention of the Government does not constitute a finding, particularly where a defendant objects to the conclusion that the contention is intended to support."). Regardless, to the extent of any inconsistency, <u>Butler</u> would have to yield to the prior decisions we cited.

Nor can Stanford find any support for her position in the out-of-circuit decision in <u>Republic Technology Fund, Inc. v. Lionel Corporation</u>, 483 F.2d 540 (2d Cir. 1973). Regarding a district court's recitation of testimony, the opinion in that case does say in a footnote that "technically" it is not a finding, because "a mere repetition of testimony is not a finding," <u>id.</u> at 548 n.7. Nonetheless, in the very sentence to which that footnote is attached, the Second Circuit actually did treat the district court's recitation of testimony as a finding of fact supportive of the accompanying judgment. Putting any perceived technicalities aside, the Court declared of the district court's recounting of testimony that: "we cannot disregard this finding, one of fact." <u>Id.</u> at 548.

Nothing in Federal Rule of Civil Procedure 52(a) is to the contrary.[3] It does not require or even arguably support construing the record or a district court's findings in the light least favorable to the judgment. Rule 52(a) is not a jurisdictional requirement. We can and have decided appeals on the merits where the district court has not even entered any findings on each separate factual issue so long as "a complete understanding of the issues" is possible. Harris v. Thigpen, 941 F.2d 1495, 1504 n.16 (11th Cir. 1991); see also Rothenberg v. Sec. Mgmt. Co., 736 F.2d 1470, 1472 (11th Cir. 1984). We "do not insist that trial courts make factual findings directly addressing each issue that a litigant raises, but instead adhere to the proposition that findings should be construed liberally and found to be in consonance with the judgment, so long as that judgment is supported by evidence in the record." United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004) (internal citation and quotation marks omitted).

In keeping with these principles, we and other federal appellate courts have inferred from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated. Acosta, 363 F.3d at 1150-51; Barber v. Int'l Bhd., 778 F.2d 750, 756 (11th Cir. 1985); see

---

[3] Rule 52(a) states in relevant part: "In all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon . . . ." Fed. R. Civ. P. 52(a).

also Zack v. C.I.R., 291 F.3d 407, 412 (6th Cir. 2002) ("[I]f, from the facts found, other facts may be inferred which will support the judgment, such inferences should be deemed to have been drawn by the District Court.") (internal marks omitted); Century Marine Inc. v. United States, 153 F.3d 225, 231 (5th Cir. 1998) ("If a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court impliedly made a finding consistent with its general holding so long as the implied finding is supported by the evidence.") (citing Gilbert, 509 F.2d at 1393); Swanson & Youngdale, Inc. v. Seagrave Corp., 561 F.2d 171, 173 (8th Cir. 1977) (inferring a factfinding that "would be consistent with the general finding[s]" of the district court); Manning v. Jones, 349 F.2d 992, 996 (8th Cir. 1965); Zimmerman v. Montour R.R., 296 F.2d 97, 98 (3d Cir. 1961); Triangle Conduit & Cable Co. v. Fed. Trade Comm'n, 168 F.2d 175, 179 (7th Cir. 1948), aff'd sub nom., Clayton Mark & Co. v. Fed. Trade Comm'n, 336 U.S. 956, 69 S. Ct. 888 (1949).

When inferring findings consistent with the district court's judgment, we are not engaging in factfinding ourselves. Instead, we are making the common sense judgment that material factual issues were resolved by the district court in favor of the judgment when it was reasonable for that court to do so in light of the evidence. This is not unlike what we do in upholding jury verdicts. Virtually every jury

verdict resolves a number of contested issues of fact without explicit factfindings. We always infer that the jury resolved every relevant factual issue in favor of its verdict. See, e.g., United States v. Yeager, 331 F.3d 1216, 1221 (11th Cir. 2003) ("[W]e view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict." (internal quotation marks omitted)). No one would suggest that by doing so we are engaging in appellate factfinding.

Of course, when we have a judge instead of a jury trying the facts, the presumption that a judge knows and correctly applied the law comes into play. Spaziano v. Singletary, 36 F.3d 1028, 1033 (11th Cir. 1994) ("'Trial judges are presumed to know the law and to apply it in making their decisions.'") (quoting Walton v. Arizona, 497 U.S. 639, 653, 110 S. Ct. 3047, 3057 (1990)). We also "assume all courts base rulings upon a review of the entire record." Funchess v. Wainwright, 772 F.2d 683, 694 (11th Cir. 1985). Those presumptions provide an added measure of assurance that any factual issues necessary to the judgment that were not explicitly resolved in a bench trial were implicitly decided in favor of the court's decision, or the court would have decided the other way.

The principles we are discussing are party-neutral and have an importance larger than the result in any specific case. It makes sense for appellate courts,

11

when they can reasonably do so, to construe any ambiguous findings and any gaps in findings in a way that supports instead of helps defeat the judgment under review. The best bet is that if an unstated fact matters to the judgment the district court implicitly resolved that factual issue in a way consistent with the judgment, and it would make an explicit finding to that effect if the case were remanded for clarification. Otherwise, the district court would have decided the case the other way to begin with.

What the decisions we have cited on this point mean is that our system has decided that it is not worth the resources or the time it would require to remand every judgment accompanied by any findings that are incomplete or ambiguous for further specification by the district court before appellate review is completed. We do not sit to grade the thoroughness or clarity of district court opinions but to review their judgments, and we do so in a way that aims to reach the heart of a case in a reasonably efficient and expeditious manner. We do not insist upon a technically perfect district court opinion containing exhaustively comprehensive, completely clear fact findings.

There is no reason particular to this case to turn the governing principles we have discussed upside down and read the district court's findings and the record from which they are drawn in a way that works against the judgment. There is no

12

reason for the district court to have recounted Agent Miles' testimony about Stanford's change of story unless the court intended to find as a fact that what the agent said was true. The testimony was undisputed. It was given by an agent whom the district court clearly credited on other matters without ever suggesting that he might not be credible on this one. The district court recounted the testimony in a section labeled "Facts," which began with "[t]he facts of this case are as follows," and ended with "[i]t is upon the above-related facts that the Court bases its decision." Those written factfindings were issued after the court had previously stated into the record oral findings that included a specific reference to "the inconsistent statements by Ms. Stanford as to . . . how she came to be carrying [the cash]."

For all of these reasons, and recognizing that "findings should be construed liberally and found to be in consonance with the judgment," Acosta, 363 F.3d at 1151 (internal citation and quotation marks omitted), we will treat the testimony of Agent Miles about Stanford changing her story as a fact. Accordingly, we will include it in the following discussion of the relevant facts, some of which are taken directly from the district court's opinion and others of which are garnered from the record viewed in the light favorable to the court's judgment.

13

# III.[4]

[4]In setting out the facts relating to probable cause, we confine ourselves, as the parties have confined themselves in their arguments, to the evidence introduced by the government in the first phase of the bench trial, where the government had the burden to show probable cause to believe the property was the proceeds of or otherwise connected with illegal drugs. Stanford had an opportunity during the first phase to present evidence negating probable cause, but she declined to do so. Stanford did testify at the second phase of the trial, after the government's showing of probable cause had shifted to her the burden of establishing by a preponderance of the evidence a defense (innocent property or innocent owner). We do not consider Stanford's testimony or any other evidence from that second phase of the trial in deciding whether the government established probable cause.

In his concurring opinion, Judge Tjoflat says we should, even though he agrees with us that considering the second phase evidence would not change the result; if he thought otherwise, his opinion would be a dissent, not a concurrence. Because it makes no difference to this case, this is not the time to decide whether the evidence that came in after probable cause had been established and the burden had shifted to Stanford to prove a defense should be considered on the probable cause issue itself. That which does not matter need not, and usually should not, be decided.

Another good reason not to decide whether Judge Tjoflat's position is correct is that neither party has argued it to us. Both sides have limited their arguments to whether the evidence the government put in during the probable cause part of the trial was sufficient to show probable cause. That is what they did before the panel, which agreed with them about it, $242,484.00, 351 F.3d at 505 n.9, and that is what they have done before us.

Nor did the district court in its dispositive order consider any of the post-probable cause phase evidence on the issue of probable cause. The concurring opinion's assertion that the district court did so relies heavily on three block quotes, all of which are lifted from the section of the district court's order labeled "C. Claimant's Burden." That section is devoted exclusively to a discussion of whether Stanford had met her burden of establishing a defense once the government had shown probable cause. Immediately preceding that part of the order is a separate section, labeled "B. Probable Cause," in which the court discusses in detail the law and evidence relating to the probable cause issue. Three full pages of that section explain the facts upon which the court based its conclusion that probable cause has been shown, and not one of those facts is based upon anything except the evidence presented during the government's case. At the end of that section of its order, following its conclusion that probable cause had been shown, the district court stated that the burden had therefore shifted to Stanford to prove one of the defenses. Only thereafter, in considering whether Stanford had proved a defense, did the district court, in the "C. Claimant's Burden" section, say what the concurring opinion has in block quotes.

14

On December 10, 1998, Deborah Stanford flew from Miami to New York City on a round-trip ticket for which she had paid $93 in cash on December 8. The ticket she purchased had her returning to Miami on December 12, but she was a no-show for the return flight "for reasons unclear." Later that day, Stanford called and rescheduled her flight for the next day, December 13, but she did not make that flight either. She changed her flight plans one more time and eventually made it to the airport to catch a flight departing New York on the morning of December 14.

At the airport in New York, Stanford was required to put the school-type backpack she was carrying through the X-ray machine. When the security workers manning the machine questioned her about the contents of the two packages in her backpack, Stanford became belligerent. She eventually removed the packages

At this late stage of the proceedings we will not adopt an approach not followed by the district court or suggested by either party, but will instead decide the case as the parties have argued it to us. In doing so, we do not mean to imply that we doubt the validity of Judge Tjoflat's approach in the typical civil case and in most future forfeiture cases (given the amendment of the statute). In the typical civil case the same party, the plaintiff, has the burden throughout the trial, and in that context it makes sense to consider all of the evidence presented during the trial in determining whether the plaintiff has met its continuous burden. The authorities cited in the concurring opinion speak to that normal circumstance. But this case is different because of the unusual burden-shifting procedure employed in the forfeiture statute that governs it. Under the pre-amendment version of this statute, the government bears the burden of establishing probable cause, and once it has done so the burden shifts to the defendant to establish by a preponderance of evidence either of two defenses, one of which is the absence of an illegal drug connection to the property. One might make this argument against Judge Tjoflat's position: It makes no sense to say that evidence introduced after the government has made the showing necessary to shift the burden to the defendant can be used to determine whether the government has made the showing necessary to shift the burden to the defendant. However, for the reasons we have discussed we have no occasion to decide in this case if that argument or Judge Tjoflat's position should prevail.

15

from the backpack and showed them that the packages were filled with currency. Although one of the workers started to confiscate the currency, she was countermanded by a superior. Stanford was allowed to carry the backpack and its contents on board her flight to Miami.

One of the security workers in New York approached Drug Enforcement Agency Agent Bradley Cheek, a member of the airport's drug interdiction unit, and told him what had happened. Cheek called DEA Special Agent Kenneth Miles at the Miami International Airport and informed him about the incident. Cheek described Stanford to Miles and said that she was carrying two packages containing a large amount of cash in a carry-on bag. Agent Miles, Special Agent John Eric Johnson, and three or four others went to the gate where Stanford's flight was to arrive.

After Stanford exited the airplane in Miami, Agents Miles and Johnson recognized her based on Agent Cheek's description. They approached her, showed her their DEA credentials, and asked to speak with her. She consented. They asked to see her plane ticket and driver's licence, and she complied. The name on the ticket, her real name, matched the one on the Florida driver's licence she produced.

Agent Miles asked Stanford if she was carrying any contraband, weapons, or large sums of currency, and she responded that she was carrying money. He asked

16

her how much money, and she responded "about two." When asked "two what?," she answered "about two hundred thousand." Miles asked Stanford where it was, and she pointed to her backpack. He asked if he could see the money, and she consented.

The backpack contained two large packages full of currency in bundles. One of the packages was "wrapped in brown paper wrapping and overlaid with black plastic wrap, cellophane wrap." The other package contained bundles of cash "wrapped in plastic cellophane and . . . contained in [a] Christmas shopping bag." All of the currency was, as the district court found, "sealed in a cellophane-type material." The cash was bundled together with rubber bands, in non-uniform bundles in various denominations, without any bank wrappers. There were 18,362 bills, and they weighed a total of 40.5 pounds.[5]

After initially telling the agents there was about $200,000 in cash, and then denying that she knew exactly how much there was, Stanford finally told the agents that the black-plastic wrapped package contained $79,900.00, and the Christmas bag wrapped package contained $162,750.00, which would have totaled $242,650.00. She was over by only $166.00 – the two packages actually contained

---

[5] Agent Miles, who lifted and carried the backpack before the cash was removed from it, testified that it weighed 40 to 50 pounds. According to the United States Bureau of Engraving: "The approximate weight of a currency note, regardless of denomination is (1) one gram." See http://www.moneyfactory.com/document.cfm/18/106. Therefore, 18,362 currency notes weigh approximately 18,362 grams or 40.5 pounds.

17

a total of $242,484.00 in cash.  A later count of the currency Stanford was carrying determined that it was in the following denominations:

| Denomination | Quantity | Amount |
| --- | --- | --- |
| $1.00 | 6419 | $ 6,419.00 |
| $5.00 | 1645 | $ 8,225.00 |
| $10.00 | 1823 | $ 18,230.00 |
| $20.00 | 7648 | $ 152,960.00 |
| $50.00 | 521 | $ 26,050.00 |
| $100.00 | 306 | $ 30,600.00 |
| TOTAL: | 18362 | $ 242,484.00 |

The agents questioned Stanford about how she came to have nearly a quarter of a million dollars in cash in a backpack she was carrying from New York City to Miami.  She first told the agents that the reason she had gone to New York City was unrelated to the $242,484.00 in cash.  Stanford insisted that the only reason she had gone to New York was because of a court case relating to a traffic accident which had occurred ten years earlier.  She never produced any documents relating to the court case.

According to this first story, after Stanford had arrived in New York for the traffic accident case, her brother called her and told her to pick up some money for him on behalf of their business, Mike's Import and Export.  She told the agents that her brother asked her to pick up the cash from "some people" while she was there and bring it back to him in Miami. Agent Miles asked her several times who "some people" were, and she responded "some people" and "I don't know, just some people." She said that she did not know their names.

18

Not only could Stanford not identify the people who gave her all the cash, she could not tell the agents where she had met with them to get the cash. She claimed that her brother had told her where to go, given her directions, and said that the people would get in touch with her. When asked how she would have known who the people were when she went to meet them, Stanford told the agents "They would know." Stanford could not produce any documentation, in the form of receipts or otherwise, evidencing the transfer of the $242,484.00 in cash to her from "some people" whose identities she did not know.

Agent Miles asked Stanford several times where she had stayed during her four nights in New York, but she claimed that she did not know. Miles took from Stanford an envelope on which was written the name of the Newton Hotel in New York City, a phone number, and what he suspected to be a room number. Miles called the hotel, then sent it a DEA subpoena for the relevant records. The records revealed that no one by the name of Deborah Stanford had stayed there during the time in question.

Stanford also told the agents that she was the president of "Mike's Import and Export," the business for which she was carrying the cash. One of the agents ran "Mike's Import and Export" through the DEA's Narcotics and Dangerous Drug Information System ("NADDIS"). It scored a "hit" for "Mike's Import and Export NV," and showed aliases for this company including "Mike's Electronics Import

19

and Export" and "Mike's Import Export," with a business address in Opa Locka, Florida. The database report on the business stated: "Possible utilized for money laundering." The report had two dates listing the business as being involved in money laundering. Stanford told the agents that it was common for her to carry large sums of money for that business, but she said that usually the money was wired to its bank.

While they were interviewing Stanford, the agents sent for Rambo, a narcotics-detecting dog. Rambo graduated from the United States Canine Academy and Police Dog Training Center, earned certification from the National Narcotics Detector Dog Association, and has an enviable rating. One of Rambo's trainers testified that Rambo's "proficiency record would show that he's very well certified in the community," and added that Rambo was probably one of the best dogs he had trained in the 23 years he had been doing it. Rambo's field of specialty is detecting cocaine, marijuana, heroin, and methamphetamine. Not being a "cash hound," Rambo does not alert to the scent of untainted currency, but only to the scent of one of those four drugs. The backpack with the money was placed with four or five other bags while Rambo and his handler were out of the room. Rambo was brought in, and he alerted to Stanford's backpack, "indicat[ing] positive to the presence of a controlled substance in that bag."

After Rambo alerted, and Agent Miles had pressed Stanford about the details of the ten-year old court case she claimed had been the purpose of her trip, Stanford changed stories. She dropped her original story about the court case and told the agents that she had gone to New York for the specific purpose of picking up the cash. After Stanford told this second story, she got into a "heated exchange" with James Williams, the DEA supervisor, who had entered the room. She demanded that she be allowed to phone an attorney and was directed to the bank of pay phones outside the office. Stanford phoned an attorney, the DEA kept the money, and she left the airport. Stanford was never arrested or charged with any crime arising out of these events.

As part of the follow-up investigation, Agent Miles obtained the business addresses of Mike's Import and Export USA, Inc., and went there to investigate. Two addresses were listed for Mike's, both in Opa Locka, Florida. Several different businesses were listed as using both addresses. When Miles went to the first address he found that it was a modest, single family home located in a residential neighborhood. Agent Miles spoke with a man at the house who said that Stanford lived there, renting the front part of the residence from him. The second address for Mike's was also a house in a residential neighborhood. Neither gives the appearance of housing a business that would legitimately generate anywhere near a quarter of a million dollars in cash.

21

## IV.

### A.

Under the civil forfeiture statute applicable to this case, "[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . ., all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of " the drug laws "shall be subject to forfeiture to the United States." 21 U.S.C. § 881(a)(6) (1994). The government has the initial burden of showing probable cause to believe that the money is the proceeds of, or is otherwise connected to, any illegal drug transaction. United States v. Carrell, 252 F.3d 1193, 1201 (11th Cir. 2001).

Probable cause in this context is a "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion – the same standard used to determine the legality of arrests, searches, and seizures in criminal law." United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties, 941 F.2d 1428, 1440 (11th Cir. 1991) (internal quotation marks and citations omitted); see also United States v. Cleckler, 270 F.3d 1331, 1334 (11th Cir. 2001) (per curiam) (same); United States v. Four Parcels of Real Prop. on Lake Forrest Circle, 870 F.2d 586, 590 n.10 (11th Cir. 1989) (probable cause in this context is "the same standard used to determine the legality of arrests, searches, and seizures in criminal law"); United States v. $364,960.00, 661 F.2d

22

319, 323 (5th Cir. Unit B 1981) (noting "that the definition of probable cause applicable here is the same as that which applies elsewhere").

The government may use both circumstantial evidence and hearsay evidence to show probable cause. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties, 941 F.2d at 1440. It does not need to show a relationship between the property and a particular drug transaction – only that the property was related to some illegal drug transaction. Id. Further, "that the evidence presented would support an alternative hypothesis does not prevent it being probative on the issue of probable cause." Id. (internal quotation and citation omitted). In other words, if the evidence could support a finding that the currency was derived from or significantly related to an illegal drug transaction, and that same evidence viewed another way could also support a finding that the money was linked to another type of transaction, the district court is not prevented from finding that evidence probative on the issue of probable cause.

Finally, "[i]n evaluating the evidence of proceeds traceable to drug transactions, we have eschewed clinical detachment and endorsed a common sense view to the realities of normal life applied to the totality of the circumstances." Carrell, 252 F.3d at 1201 (internal quotation marks and citations omitted); see also Four Parcels of Real Prop. in Greene & Tuscaloosa Counties, 941 F.2d at 1440 ("[T]he existence of probable cause is judged not with clinical detachment, but

23

with a common sense view to the realities of normal life." (internal quotation marks and citations omitted)); United States v. $4,255,000.00, 762 F.2d 895, 904 (11th Cir. 1985) (same).

**B.**

Applying these principles to the totality of the circumstances described by the facts of this case, there is more than enough cause to believe that the 40 pounds of cash Deborah Stanford was carrying on December 14, 1998 was the proceeds of, or otherwise traceable to, illegal drug transactions.

**1.**

The first important fact that lights up the probable cause inquiry with significance is the sheer quantity of cash that Stanford was carrying: nearly a quarter of a million dollars in currency. Much of it was in small denomination bills. There were 6419 one-dollar bills, 1645 five-dollar bills, 1823 ten-dollar bills, 7648 twenty-dollar bills, 521 fifty-dollar bills, and 306 one-hundred dollar bills. The bulk of it all was enough to weigh down a backpack.

A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. Referring to the risk of carrying that much cash around, one of the agents testified, "[t]hat's a

24

rather unusual way to transport money, especially in the New York City area, not to take anything away from New York City." Legitimate businesses wire cash between bank accounts or they convert large sums of cash into cashier's checks. Stanford told the agents that her business, Mike's Import and Export, had wired money in the past, but she offered no explanation for why this money was not wired. The obvious reason is that wiring a sum of money that large would have generated a currency transaction report, see 31 U.S.C. § 5313; 31 C.F.R. § 103.22; United States v. Belcher, 927 F.2d 1182, 1183, 1185-86 (11th Cir. 1991), something that those who deal in drug proceeds want to avoid at all costs.

Likewise, even if there were some undisclosed but legitimate reason for not wiring the money, and for not converting it into a cashier's check, Stanford or those who gave her the money could have reduced substantially the bulk of the bills by taking all that cash into any bank in New York City and having the smaller denomination bills converted into larger ones. The 18,362 bills could have been exchanged at a bank for the same monetary amount in 2431 bills (2424 hundreds, 1 fifty, 1 twenty, 1 ten, and 4 ones). That would have reduced the weight of the cash from approximately forty-and-a-half pounds to about five-and-a-half pounds, and reduced the bulk of it accordingly.[6] Of course, those who deal in drug-tainted

_____

[6] Because currency notes weigh one gram each, the weight of the 18,362 currency notes was 40.5 pounds. See n.5, above. The weight of 2424 notes would have been 2424 grams or 5.3 pounds.

money cannot avail themselves of such conveniences, because having a bank convert more than 18,000 bills of various denomination into fewer than 2500 higher denomination bills would generate a currency transaction report.

Although the quantity of the cash alone is not enough to connect it to illegal drug transactions, United States v. $121,100.00, 999 F.2d 1503, 1506 (11th Cir. 1993), it is a significant fact and weighs heavily in the probable cause calculus. As a matter of common knowledge and common sense, legitimate businesses usually do not transport this much cash by couriers. The same is not true of drug rings, which commonly do utilize couriers to transport in cash their ill gotten gains, which can be huge. The district court put it nicely: "[O]ne would be hard-pressed to encounter a dealer in narcotics who accepted a personal check or a credit card payment."

## 2.

There is more about the cash than just the amount of it being transported. As Agent Johnson testified: "[F]irst of all, the way the bundles were wrapped in rubberbands in various denominations with the lack of any kind of bank wrappers wrapped around the bundle, they were not uniform bundles, to me as a trained drug enforcement agent, that to me was indicative of a drug organization bundling money." Agent Miles added that rubber-banded money is one of the things that he, as a trained drug agent, looks for. Although we must decide the legal issue of

26

whether probable cause exists ourselves, we do give weight to the inferences that law enforcement agents draw from the facts, as the Supreme Court has instructed us to do. See Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996) (Having concluded that the standard of review is de novo, "we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.").

### 3.

The cash was also, as the district court found, "sealed in a cellophane-type material." Wrapping cash in cellophane-type material is a technique known to be used by drug dealers to prevent discovery by drug-sniffing dogs. See United States v. $42,500.00, 283 F.3d 977, 982 (9th Cir. 2002) ("[C]ellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs."). Wrapping the cash in a cellophane-type material – instead of in paper, or cloth, or carrying it in a box – added nothing to Stanford's ability to transport the cash, but it did enhance her chances of getting it past drug-sniffing dogs.[7]

---

[7] In this case the special wrapping proved ineffective to mask the scent of drugs from Rambo, because a hole big enough to show the contents inside was poked in the wrapping before the dog was brought in.

**4.**

As the district court also found, the use of Christmas wrapping to conceal the currency was consistent with the way drug rings send their illicit proceeds by couriers. That finding has ample support in the testimony of Agent Johnson. He explained at trial how drug organizations will go to any length to conceal the cash a courier is carrying, and putting it in a Christmas bag or wrapping during the holiday season is one way of doing that.

Considering all of the facts about the cash and the way in which it was being transported, the district court concluded they were "indicative of illicit activity," "highly suspicious," and "consistent with the behavior of a courier of drug proceeds." We agree.

**5.**

The district court noted that "the route and circumstances surrounding Ms. Stanford's travel is in line with typical drug transactions." Based upon Agent Johnson's testimony, the court found that "drug organizations often utilize the Miami-to-New York flight corridor to disseminate drugs from South Florida, where many drugs initially enter the country," and "[t]he reverse path, New York to Miami, is used to bring the proceeds from these drugs back to South Florida." Although many large and even medium size cities are considered source cities or transshipment points to one extent or another, there are source cities and then there

28

are source cities. Agent Johnson, whose testimony the district court credited, explained that most of the drugs coming from South America for the Eastern Seaboard travel from Miami to New York, and "when they need to move money it's generally from New York to Miami, at least the currency that is destined for South America, Colombia in particular."

When asked on cross-examination to agree that people traveling between New York and Miami doesn't mean anything these days, Agent Johnson answered: "It means something if they are carrying a large amount of currency, yes." Likewise, the district court found that: "[W]hen viewed as part of the totality of the circumstances, and considering the real-world happenings as testified to by those who know – including DEA agents Miles and Johnson – this is one more factor weighing in favor of a finding of probable cause."

Agent Johnson's testimony and the district court's finding about the significance of the route are consistent with the observations in a number of decisions. See United States v. One 1980 Bertram 58' Motor Yacht, 876 F.2d 884, 888 (11th Cir. 1989) (finding Miami "a known center for drug-smuggling activities"); $4,255,000.00, 762 F.2d at 904 (noting that it is proper to take into account in a civil forfeiture proceeding the fact that "Miami has become a center for drug-smuggling and money-laundering"); United States v. $129,727.00, 129 F.3d 486, 490 (9th Cir. 1997) (describing New York City as a source for drug-

related money and recognizing that travel from it with large amounts of cash is consistent with drug courier profile); United States v. $67,220.00, 957 F.2d 280, 285 (6th Cir. 1992) (Miami is "a well-known source city for drugs."); United States v. $215,300, 882 F.2d 417, 419 (9th Cir. 1989) (Miami is a "well-known center of illegal drug activity."); United States v. Forero-Rincon, 626 F.2d 218, 220 (2d Cir. 1980) ("[T]he DEA has designated Miami as a 'source city'– that is, a city from which narcotics are frequently carried into the New York City area for distribution . . . ."); In re Forfeiture of $171,900, 711 So. 2d 1269, 1275 (Fla. 3d DCA 1998) ("Nor can we ignore the unfortunate fact that Miami is a center for both drug smuggling and money laundering.").

**6.**

In addition to the significance of the route along which the $242,484.00 in cash was being taken, there are also the peculiarities of Stanford's trip. The agents testified that drug couriers often travel on tickets purchased with cash, as Stanford did, and frequently change their return date, as she did twice in two days. As noted by the district court, "[d]rug enforcement officials are cognizant of the fact that 'drug deals are often delayed, causing participants to have to stay in a location longer than anticipated . . . .'" District Ct. Order at 22 (quoting United States v. Espinosa-Guerra, 805 F.2d 1502, 1508 (11th Cir. 1986)). The district court appropriately found the facts that Stanford had purchased her ticket with cash and

30

was twice a "no show" for her scheduled return were proper factors to consider in its probable cause determination.

**7.**

Some of the most weighty facts supporting a determination of probable cause are Stanford's own statements – what she told the agents, and what she did not tell them. Although they pressed her on it, Stanford insisted that she was unable to identify those who gave her $242,484.00 in cash. That is unusual in the extreme, except in the drug world where it is typical. As one of the agents explained, drug organizations tell a courier as little as possible to ensure that if arrested she will not be able to identify those involved in the drug ring. It is very common, he explained, for a courier not to be told the names of the people giving her drugs or currency to transport.

The district court accepted the agent's explanation of Stanford's otherwise inexplicable inability to identify those who gave her nearly a quarter of a million dollars in cash, concluding that: "This is in line with the DEA's assertion – and a commonsense understanding – that drug and drug-money couriers are usually kept in the dark as to the sources' identities so as to minimize the possibility of a detained or arrested courier providing such information to law enforcement authorities." There is no other rational explanation for Stanford's professed

31

ignorance of the identities of those who gave her the cash unless she was lying about not knowing their identities, which would itself be quite telling.

**8.**

It is also telling that Stanford claimed not to know where she had met the people she did not know for the transfer of the forty pounds of cash. Not only that, but one of the agents asked Stanford several times where she had stayed in New York City during her four days and nights there immediately preceding the interview, and she claimed not to know. The district court appropriately found that "[s]uch suspicious and evasive answers, although far from dispositive of the issue, add to the government's probable cause case."

**9.**

During the interview by the agents Stanford did tell two conflicting stories about how she came to be in New York City. First, she told the agents she had gone there in connection with a court case arising from a ten-year old traffic accident. According to this story, she just happened to be in New York for that reason when her brother called and said that he needed someone to bring back to Miami nearly a quarter of a million dollars in cash for their business. After the agents pressed her for details about the court case, Stanford changed her story and told them the purpose of her trip all along had been to pick up the cash and bring it back.

32

The change in stories is significant. Agent Miles explained that through experience he had learned that people trying to hide the truth "will forget their initial statement or try to make something up on the cuff or on the fly and they initially forget what they said the first time." People who tell the truth usually do not have difficulty keeping their stories straight about the purpose of a four-day trip they are just completing. In its oral findings the district court noted "the inconsistent statements by Ms. Stanford as to . . . how she came to be carrying [the cash]," and in its written findings the court noted the testimony – which was undisputed – that Stanford had changed her story. We, too, note the change of stories which adds to the probable cause showing.

**10.**

Although inconsistent at their core, one thing that both of Stanford's stories have in common is the total lack of any documentation to support them. She did not produce for the agents one piece of paper supporting her story about the court case she claimed to have gone to New York about. Nor could she produce any document indicating that she had picked up the cash for her business. She did not have a copy of a receipt evidencing the transfer of nearly a quarter of a million dollars in cash; she did not have any business documentation showing the money was connected to a business; nothing.

33

The agents testified to the obvious: this lack of documents reflecting the transfer of such a large sum of money is not how legitimate business transactions are handled. It is, however, the way drug rings operate. As Agent Johnson said: "Well, obviously, a drug organization is not going to document the fact that they are giving currency to a courier, so there's not going to be any documents available to the courier to corroborate a false story." The district court noted the lack of documentation in its analysis.

**11.**

Rambo, the narcotics scent detecting dog, alerted to Stanford's backpack containing the currency when it was placed among four or five bags containing sham currency. Rambo alerts not to currency itself but to the scent of cocaine, heroin, marijuana, and methamphetamine. Apparently recognizing that Rambo is a highly trained and credentialed professional whose integrity and objectivity are beyond reproach, Stanford has not attempted to attack the dog's credibility. Instead, her main tactic in regard to the alert has been to suggest that all or virtually all cash in this country is tainted with the long-lasting scent of illegal drugs, thus rendering Rambo's alert immaterial.[8]

---

[8] Stanford does point out that when the hearing was held, nearly three years after the events, Agent Miles testified that Rambo had alerted to Stanford's bag aggressively by scratching at it, because he is an aggressive alert dog. Officer Perez, who is Rambo's handler (he referred to him as his partner), testified that Rambo is a passive alert dog and that he had alerted to the presence of a drug scent from Stanford's bag by going and sitting in front of it, which is what he does. Agent Johnson testified that he witnessed Rambo's positive alert to

34

Stanford did not put into the record any evidence to support her ever-lasting scent, global contamination theory. Her counsel did try to get evidence in support of that theory in through cross-examination of the government's agents, but that attempt backfired. Counsel asked Agent Cheek whether he had "learned in the course of [his] training and [his] field operations that it has come to be the case that perhaps as much as 90 percent of all bank notes in circulation" are tainted with drugs. Cheek responded: "Not 90, I have heard 80, 70, all different amounts, but the majority of U.S. currency has allegedly been tainted by narcotics." Instead of leaving well enough alone, Stanford's counsel pressed the matter, asking Cheek whether there was "any way in the world to determine the specific point in time when the bank note is passing through commerce when it picked up whatever degree of taint it supposedly had." Cheek answered that based upon his "understanding and knowledge and experience, there is a shelf life more or less of narcotics on currency." He testified that according to what he had read and been told, "after like a week the money gets, basically gets cleansed, that there would not be enough narcotic residue on the money for a canine alert or an ion scan."

Stanford's bag, although he did not specify the type of alert. The person who trained Rambo testified that he was a passive alert dog. No one testified that Rambo did not alert, however he did it. Having heard all the testimony, the district court found that Rambo was a passive alert dog and had alerted to the presence of a narcotics smell on Stanford's backpack containing the currency. That finding certainly was not clearly erroneous.

Recoiling from that blow, counsel quickly got Cheek to agree with him that Cheek had no expertise and was just saying what somebody had told him.

The fact remains that no one with any expertise testified in support of Stanford's ever-lasting scent, global contamination theory. There is simply no basis for that theory in the evidence presented in this case.[9] Other courts, presented with different records have reached differing views about the theory.[10] On the

---

[9] The government had two experts, Dr. Furton and Dr. Rose, available to refute Stanford's theory, but she successfully objected to their testimony on grounds that the government had violated discovery rules by not giving her a summary of their testimony before trial. The expert opinion Dr. Rose gave on the subject in another case is referred to in United States v. $14,665, 33 F. Supp. 2d 47, 58 n.9 (D. Mass. 1998). Stanford's objection also prevented Rambo's trainer from testifying about what he had been taught on the subject by prominent scientists at seminars he had attended.

[10] Compare United States v. $22,474.00, 246 F.3d 1212, 1216 (9th Cir. 2001) ("[T]he government presented evidence that the dog would not alert to cocaine residue found on currency in general circulation. Rather, the dog was trained to, and would only, alert to the odor of a chemical by-product of cocaine called methyl benzoate [and] unless the currency . . . had recently been in the proximity of cocaine, the detection dog would not have alerted to it."); $14,665, 33 F. Supp. 2d at 58 n.9 ("the government has presented information that [the dog in this case alerts] not to the presence of cocaine itself, but to methyl benzoate, a chemical used in the manufacture of street cocaine. According to the declaration of Dr. Furton, an expert in the field of analytical chemistry and forensic science, methyl benzoate is a highly volatile substance that dissipates quickly when handled or exposed to air. If so, one can expect that the expired currency, even if it would have tested positive some time in the past, was functionally 'clean' of all residues that would be of interest to a canine investigator."); with United States v. $506,231, 125 F.3d 442, 453 (7th Cir. 1997) (concluding that the dog alert in that case was not probative of probable cause because the government admitted in that case that at least one-third of currency in the United States is contaminated with cocaine); Muhammed v. DEA, Asset Forfeiture Unit, 92 F.3d 648, 653 (8th Cir. 1996) (concluding that a dog alert is "virtually meaningless" because "an extremely high percentage of all cash in circulation in America today is contaminated with drug-residue"); United States v. $5,000, 40 F.3d 846, 849-50 (6th Cir. 1994) (concluding that the evidentiary value of the narcotics dog's alert was "minimal," in part based on the global contamination theory, and in part because the police officers obstructed the defendants' view of the dog's reaction to the money).

evidentiary basis in this case, or the lack of one, we decline to write the theory into the law of this circuit.

The district court found that: "All else being equal, however, the money upon which a narcotics dog 'alerts' is more likely to have come into contact with narcotics at some time in the fairly recent past than money upon which a drug dog does not alert." Concerned about statements in opinions from other circuits deprecating the probative value of the scent of drugs on cash, the court said that "although weak, this factor is relevant here." On this record, we do not share the district court's opinion that the probative value of Rambo's alert is weak; we do agree that it is relevant. It is yet another fact weighing in favor of probable cause.

**12.**

Then there is the "hit" the agents received when they ran the name of Stanford's business through the DEA's Narcotics and Dangerous Drug Information System ("NADDIS"). That system indicated: "Possible utilized for money laundering." After noting several problems with the use of the NADDIS report as evidence, the district court deemed it relevant but gave it "negligible" weight "in view of the issues of credibility that it brings to the table." However, as the Eighth Circuit has observed, "a lower degree of reliability does not foreclose the use of information, but instead only makes necessary a greater amount of other reliable information to establish probable cause." United States v. Armstead, 112 F.3d

37

320, 322 n.3 (8th Cir. 1997) (citing <u>Alabama v. White</u>, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990)). In the present case there is plenty of other reliable information to establish probable cause to connect the cash Stanford was carrying to illegal drugs.

**13.**

Finally, there is the matter of what did not happen in this case. As we have pointed out, Stanford never claimed to be the owner of the $242,484.00 in cash that she was carrying in her backpack from New York to Miami. Her story has always been that she possessed it for another or others. Yet, during the two years and nine months between the seizure of the money and the probable cause hearing, the owner or owners never came forward to claim their money.

The people who gave Stanford the forty pounds of cash in New York never stepped forward for it. Mike's Import and Export, USA, Inc., the business to which she claimed to be carrying the cash, never filed a verified claim to it. Stanford's brother Mike, whom she claimed had called and asked her to pick up the currency, never showed up either. Toward the end of the probable cause hearing, the district court asked the obvious question: "Where's Mike?" Counsel for Stanford responded that he did not know where Mike was. A large sum of legitimate cash always has one or more proud parents but drug money, once it is seized by law enforcement, is often treated like an orphan child. That is what

38

happened in this case, and it is a fact that speaks loudly on the probable cause issue.

**C.**

After reviewing the evidence, the district court found that, "based upon the totality of the circumstances as viewed with an eye toward a commonsense interpretation of these circumstances, the government established probable cause for forfeiture of the money in question." We agree. After all, probable cause is nothing more than a reasonable ground for belief in a fact – here, that the $242,484.00 in cash was substantially connected to illegal drug activities. To cross the probable cause line the evidence does not even have to establish a prima facie case, although the evidence in this case certainly did. Furthermore, we look to the totality of the circumstances and do not try to pick them off, one by one, by conjuring up some alternative hypothesis of innocence to explain each circumstance in isolation. Finally, and most importantly, we do not take an academic or theoretical approach. Instead, we eschew clinical detachment and use a common sense view to the realities of normal life.

The circumstances of this case include the fact that Stanford was carrying nearly a quarter of a million dollars in cash, forty pounds of mostly small denomination bills, rubber-banded and wrapped in cellophane and Christmas packaging. She was taking all of that cash from New York to Miami, the primary

route that drug proceeds travel along the South American and Eastern Seaboard trade corridor. She had paid cash for her round-trip ticket and had twice missed her return flight. She changed her story about why she had gone to New York City in the first place. She said that she could not remember where she had stayed while there during the previous four nights. She claimed not to know the identities of the people who gave her all that currency, and said she could not remember where she had met with them to get it. She had not a single document evidencing the transfer of the cash to her, or its origin, or its purpose. She offered no explanation for why the money, if it was legitimate, was not wired or converted to a cashier's check or some other safer and more convenient method of transportation. An experienced and highly skilled narcotics-detecting dog alerted to the scent of drugs on the cash in her backpack. Finally, Stanford never claimed to be the owner of the cash, yet the owner never stepped forward to claim it. The totality of these circumstances does establish reasonable grounds for believing that the $242,484.00 Stanford was carrying is substantially connected to illegal drug activities.

## V.

The district court's ruling that the government established probable cause for the forfeiture of the $242,484.00 in cash is AFFIRMED. The case is remanded to the panel for decision of any remaining issues.

40

TJOFLAT, Circuit Judge, specially concurring:

In the panel opinion in this case, this court noted that

> [o]ur probable-cause inquiry . . . is limited to the factual findings drawn from the evidence put forth by the government in support of probable cause. . . . Because Stanford did not testify during the probable cause portion of the hearing, we do not consider fact findings based upon Stanford's forfeiture-hearing testimony when we review whether the government established probable cause.

United States v. $242,484.00, 351 F.3d 499, 505 n.9 (11th Cir. 2003), reh'g en banc granted, 357 F.3d 1225 (11th Cir. 2004).  The full court now follows suit.  It holds that in determining whether the Government established probable cause, "we confine ourselves . . . to the evidence introduced by the government in the first phase of the bench trial, where the government had the burden to show probable cause," i.e., during the Government's case-in-chief.  Ante at ___ n.4.  We are not to consider the evidence Stanford presented after the Government rested and the court denied her motion for judgment, even though that evidence, at least in part, bolstered the Government's case.[1]

In limiting its review to the evidence presented in the Government's case-in-chief, the court overlooks the rule that where, as here, the trial judge does not grant

---

[1] In this case, the defendant is $242,484.00, and Stanford is the claimant.  As a practical matter, Stanford stands in the shoes of a defendant in an in personam civil action.  Thus, as I note in the text infra, pursuant to Rule C(6)(a)(i) and (iii) of the Supplemental Rules for Certain Admiralty and Maritime Claims, Stanford responded to the Government's complaint by filing (1) a verified claim "identifying [her] interest or right" in the "property that is the subject of the action" and (2) an "answer."

the defendant's motion for judgment made at the close of the plaintiff's case and the defendant proceeds with its defense and presents evidence, the judge must consider that evidence along with the evidence the plaintiff introduced (in its case-in-chief or on rebuttal) in deciding whether the plaintiff should prevail. And if the court grants the plaintiff judgment and the defendant appeals, the rule is that the court of appeals likewise must consider all of the evidence in entertaining the defendant's argument that the plaintiff failed to prove its claim.

I write separately because this case presents no principled reason for disregarding this rule. As I point out in Part II below, the analytical approach to the question this appeal poses—whether the trial judge erred in considering the evidence Stanford introduced in deciding whether the Government established probable cause—is provided by the Federal Rules of Civil Procedure and the case law implementing them. Therefore, since the Federal Rules of Civil Procedure provide the framework for deciding Stanford's appeal, today's decision will apply in all cases tried under those rules.[2]

---

[2] Moreover, in cases tried to the bench, a defendant reading today's decision will be led to believe that after the trial judge has either denied, tentatively denied, or reserved ruling on its motion for judgment made at the close of the plaintiff's case-in-chief, the judge will rule on the sufficiency of the plaintiff's case at the end of the day without considering any of the evidence the defendant introduced—including evidence that buttressed the plaintiff's claim. Trial judges, in turn, will be led to believe that it matters not whether they deny, tentatively deny, or reserve ruling on the defendant's motion for judgment made at the close of the plaintiff's case-in-chief; they can revisit the motion after the defendant has put on its case without considering any of the evidence the defendant (or the plaintiff in rebuttal) adduced. Finally, because today's decision cannot be limited to in rem forfeiture proceedings, subsequent panels of this court will be called upon to entertain arguments—in civil cases tried to the bench—that the trial court erred in not

Concerned that the rule I have described does govern our review of the district court's probable cause determination in this case, the court carves out a fall-back position. The court need not follow the rule because the parties' briefs—to the panel and to the court on rehearing en banc—failed to cite the rule. Ante at ___ n.4. The Government's brief writer, apparently ignorant of the rule, unwittingly agreed with Stanford that we should resolve the probable cause issue without considering the evidence Stanford presented after the district court declined to grant her motion for judgment made at the close of the Government's case-in-chief.[3] In Part III, I demonstrate the fallacy of the court's fall-back position. It has no currency in law; what is worse, it is destined to breed considerable mischief.

## I.

At the close of the Government's case-in-chief, Stanford orally moved the district court "to dismiss the verified complaint . . . on the basis [that] the

---

granting the defendant's motion for judgment made at the close of the plaintiff's case-in-chief.

[3] "Another good reason not to decide whether Judge Tjoflat's position is correct is that neither party has argued it to us. Both sides have limited their arguments to whether the evidence the government put in during the probable cause part of the trial was sufficient to show probable cause." Ante at ___ n.4. Stanford would have met with a slam-dunk defeat had she included in her probable cause challenge (in this appeal) the evidence she introduced after the court tentatively denied her motion for judgment made at the close of the Government's case-in-chief. That is why she insisted on the limited review the court employs. Consequently, when the court says that the parties limited their arguments to the evidence presented during the Government's case-in-chief, what it should really be saying is that the Government, in its answer brief, failed to point out that by putting on a case after her motion for judgment was denied, Stanford waived her right to appeal the court's refusal to grant her motion.

43

government ha[d] not satisfied its burden." After hearing argument from the parties, the court made a tentative ruling that the Government had satisfied its burden to show probable cause. This ruling was not final.[4] Rather, the court said it would later "try to write the best decision" it could, and then encouraged the parties to consider settlement. After issuing this tentative ruling, Stanford proceeded with her defense—in rebuttal of the Government's case-in-chief and in support of her "innocent owner" claim. For the most part, this defense consisted of her own testimony.

In its dispositive order, the court considered the evidence Stanford presented. Some of this evidence related directly to the issue of probable cause.[5] First, the court noted the deficiencies in Stanford's testimony about the workings of her business, Mike's Import and Export USA, Inc. ("Mike's"), and how her business came to acquire the money the Government sought to seize:

---

[4] The court issued its ruling from the bench: "[W]hat I am going to tell you now is a tentative ruling because we are going to enter a written order . . . ." The court's language at the conclusion of the hearing also suggests that the ruling at the close of Government's evidence was tentative. At that point, the court stated:

> I think . . . the case comes down to . . . the probable cause stage and whether there's a drug nexus . . . .
> I am going to try to enter a written order in this case rather than try to announce a decision now. . . . And I will try to deal with all of these issues because I, frankly, think it's a very close question on the probable cause, at that level, given the cases both ways.

[5] Much of what is cited here comes from the district court's dispositive order, section C, entitled "Claimant's Burden" and relates to the probable cause issue.

44

> Ms. Stanford claimed that the money derived from [Mike's], of which she at all times has been a principal. She testified that Mike's at times would receive money from Surinamese individuals in the New York area, which would be used to buy goods and ship them to recipients in Surinam. It would seem relatively simple for Ms. Stanford to have come forth with proper documentation of this, such as receipts for the money received. At trial, Ms. Stanford failed to explain exactly how Mike's made money on a transaction such as the one described.

Second, the court found it peculiar that Stanford was unable to identify the people who gave her the money or the people she stayed with in New York:

> [W]hen questioned at trial, Ms. Stanford claimed that she had stayed in Brooklyn with "some friends," whom she claimed to be "friends of long-standing," although she could not identify these "friends." At trial, she testified that she picked up the money from two men whom she could not identify at a café in Brooklyn that she could not describe. The Court finds this lack of knowledge probative on the issue of the legitimacy of the money.

Third, the court considered the fact that Mike's did not typically transact business in the way Stanford alleged in her testimony:

> At trial, the government offered evidence of various wire transfers between banks in New York and Mike's. See Gov't Exhs. 25, 26.[6] This was not a business unfamiliar with wire transfers. However, none of the wire transfers approached the amount of cash

---

[6] The Government introduced exhibit 25 during its case-in-chief, in the course of Agent Kenneth Miles's testimony. On the other hand, the Government introduced exhibit 26 on cross-examination of Stanford. This shows an additional risk that a claimant takes in presenting her own evidence. Not only might the claimant present evidence that is damaging to herself, but the government may adduce damaging evidence on cross-examination.

45

carried by Ms. Stanford.  Moreover, while the records show some cash deposits, all were of small amount.  Mike's business records do not provide any explanation for this transaction.

Finally, the findings of fact, upon which the court premised its conclusions of law,[7] clearly derive from a consideration of the testimony of both Government witnesses and Stanford herself.  See Mem. Op. at 4 n.4 ("Ms. Stanford denied that Agent Miles poked holes in the wrapping, although she acknowledges giving the agent consent to look into the backpack itself."); id. at 5 n.5 ("At trial, Ms. Stanford testified that it was her brother Wilbert, who at that time in 1998 was associated with Mike's Import and Export USA, Inc., who had called her in New York.").

Thus, in reaching its judgment, the district court considered, and relied upon, evidence introduced during Stanford's case.  Much of this evidence was germane to a determination of probable cause.  We are required to take it into account, as I explain in Part II.

## II.

### A.

The Federal Rules of Civil Procedure (the "Civil Rules"), as modified by the Supplemental Rules for Certain Admiralty and Maritime Claims (the

---

[7] Indeed, the court expressly noted that "[i]t is upon the above-related facts that the Court bases its decision."  Mem. Op. at 5.

"Supplemental Rules"), govern the litigation of in rem forfeiture proceedings.[8]

See 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §

1020, at 92 (2d ed. 1995) ("The Federal Rules of Civil Procedure are . . . applicable

to actions for forfeiture of property for violation of a statute of the United States.").

The Supplemental Rules prescribe the pleadings necessary to bring an in rem

forfeiture action to issue. Rule C(2) specifies what the complaint must contain.[9]

---

[8] Rule A of the Supplemental Rules entitled "Scope of Rules," states, in relevant part:

> These rules . . . apply to the procedure in statutory condemnation
> proceedings analogous to maritime actions in rem, whether within
> the admiralty and maritime jurisdiction or not . . . .

> The general Rules of Civil Procedure for the United States
> District Courts are also applicable to the [in rem] proceedings
> except to the extent that they are inconsistent with these
> Supplemental Rules.

[9] Rule C(2) ("Complaint"), as amended in 2000, states, in relevant part:

In an action in rem the complaint must:
  (a) be verified;
  (b) describe with reasonable particularity the property that is the subject of the
  action;
  . . . .
  (d) in a forfeiture proceeding for violation of federal statute, state:
      (i) the place of seizure and whether it was on land
      or on navigable waters;
      (ii) whether the property is within the district, and if the
      property is not within the district the statutory basis for the
      court's exercise of jurisdiction over the property; and
      (iii) all allegations required by the statute under which the
      action is brought.

Rule C(2), as it read at the time the Government filed its complaint in this case, read, in relevant
part:

Rule C(6)(a) tells a party claiming "an interest in or right against the property subject to the forfeiture action" how it is to respond to the complaint. Within the time period set by the Rule, the claimant must file a "verified statement identifying [its] interest or right" in the property and thereafter an "answer."[10] The issues in

> In actions in rem the complaint shall be verified on oath or solemn affirmation. It shall describe with reasonable particularity the property that is the subject of the action and state that it is within the district or will be during the pendency of the action. In actions for the enforcement of forfeitures for violation of any statute of the United States the complaint shall state the place of seizure and whether it was on land or on navigable waters, and shall contain such allegations as may be required by the statute pursuant to which the action is brought.

For purposes of this case, the changes made by the 2000 amendment are immaterial.

[10] Rule C(6) ("Responsive Pleading; Interrogatories"), as amended in 2000, states, in relevant part:

(a) Civil Forfeiture. In an in rem forfeiture action for violation of a federal statute:

(i) a person who asserts an interest in or right against the property that is the subject of the action must file a verified statement identifying the interest or right:
    (A) within 30 days after the earlier of (1) the date of service of the Government's complaint or (2) completed publication of notice under Rule C(4), or
    (B) within the time that the court allows.
(ii) an agent, bailee, or attorney must state the authority to file a statement of interest in or right against the property on behalf of another; and
(iii) a person who files a statement or interest in or right against the property must serve and file an answer within 20 days after filing the statement.

Rule C(6) ("Claim and Answer; Interrogatories"), as it read at the time the Government filed its complaint in this case, read, in relevant part:

> The claimant of property that is the subject of an action in rem shall file a claim within 10 days after process has been executed, or within such additional time as may be allowed by the court, and shall serve an answer within 20 days after the filing of the claim.

48

this case were joined in that manner.  The Civil Rules thereafter governed the

litigation of the case, including the conduct of the trial.

The rule that provides the answer to the question whether the district court

erred when it took Stanford's testimony into account in resolving the probable

cause issue is Civil Rule 52(c).  That rule reads as follows:

> If during a trial without a jury a party has been fully
> heard on an issue and the court finds against the party on
> that issue, the court may enter judgment as a matter of
> law against that party with respect to a claim or defense
> that cannot under the controlling law be maintained or
> defeated without a favorable finding on that issue, or the
> court may decline to render any judgment until the close
> of all the evidence.  Such a judgment shall be supported
> by findings of fact and conclusions of law as required by
> subdivision (a) of this rule.

In addressing a Rule 52(c) motion, the court does not view the evidence

in the light most favorable to the nonmoving party, as it would in passing on a Rule

56 motion for summary judgment or a Rule 50(a) motion for judgment as a matter

of law; instead, it exercises its role as factfinder.  See Caro-Galvan v. Curtis

Richardson, Inc., 993 F.2d 1500, 1504 (11th Cir. 1993) ("[U]nder [Rule 52(c)],

'the court must weigh the evidence and may consider the witnesses' credibility.'"

---

> The claim shall be verified on oath or solemn affirmation, and
> shall state the interest in the property by virtue of which the
> claimant demands its restitution and the right to defend the action.
> If the claim is made on behalf of the person entitled to possession
> by an agent, bailee, or attorney, it shall state that the agent, bailee,
> or attorney is duly authorized to make the claim.

For purposes of this case, the changes made by the 2000 amendment are immaterial.

(quoting Chris Berg, Inc. v. Acme Mining Co., 893 F.2d 1235, 1238 n.2 (11th Cir. 1990))).[11]

As recited in Part I, supra, the district court tentatively denied Stanford's motion for judgment made at the close of the Government's case-in-chief. Because the ruling was only a tentative, non-binding one, its effect was the same as a reserved ruling. This court addressed a similar reserved ruling in Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc., a case in which the defendants moved for judgment as a matter of law pursuant to Civil Rule 50(a) at the close of the plaintiff's case. 162 F.3d 1290, 1305 n.31 (11th Cir. 1998). We questioned whether the trial judge, and this court on review, could revisit the motion without taking into account the evidence the defendants presented to the jury after the court reserved ruling. Our answer was that

> Rule 50(a) does not authorize a trial judge, after the defense has presented its case (in whole or in part), to revisit, and grant, a defense motion for judgment as a matter of law made at the close of the plaintiff's case without considering, in addition to the evidence presented in the plaintiff's case, the evidence presented by the defense.

Id. In other words, when a trial court reserves ruling on a motion for judgment as a matter of law, it effectively denies the motion. See 9A Wright & Miller, supra §

---

[11] In Caro-Galvan, we applied Civil Rule 41(b) as it read at the time that case was tried. We noted that the relevant "language was [subsequently] removed from Rule 41(b)," and "[i]ts substance is found in the current version of Rule 52(c)." Caro-Galvan, 993 F.2d at 1503 n.7.

2573.1, at 495-96 ("Although in some cases federal courts formally reserve[] decision on the motion at the close of a plaintiff's case until all the evidence had been heard, nothing turns on whether the trial judge does this or merely denies the earlier motion.").

The same result obtains where the court makes a "tentative ruling," as the trial judge did in this case. Our predecessor circuit long ago recognized that a tentative ruling on a motion for judgment made during a bench trial similarly lacks the binding force of a granted motion:

> The trial judge may conclude, as occurred in this case, that it is inadvisable to sustain the defendant's motion midway in the trial and that the trial should be completed. The denial amounts to no more than a refusal to enter judgment at that time, a tentative and inconclusive ruling on the question of the plaintiff's proof. It does not preclude the trial judge from making, at the conclusion of the case, findings and determinations at variance with his prior tentative ruling.

Weissinger v. United States, 423 F.2d 795, 797-98 (5th Cir. 1970) (en banc).[12]

Thus, the district court's tentative ruling was the functional equivalent of a reserved ruling on the issue of probable cause. See id. The court essentially told the parties how it would likely, but not certainly, rule. Once the court heard Stanford's testimony, it was powerless to ignore it, even for the purposes of revisiting the earlier tentative ruling.

---

[12] In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Under the approach the court endorses today, a defendant is given two bites at the apple. A defendant who unsuccessfully moves the court for judgment at the close of the plaintiff's case can put on its case with the knowledge that the court will revisit its motion without considering any of the evidence it presented. Thus, at the end of the day, the defendant will have two shots at the sufficiency of the plaintiff's claim. The first will be based on the record as it stood at the close of the plaintiff's case; the second will based on the record of the trial as a whole.[13]

In criminal cases, the defendant is expressly given two bites at the apple. See Fed. R. Crim. P. 29(b) ("If the court reserves decision [on the defendant's motion for judgment of acquittal], it must decide the motion on the basis of the evidence at the time the ruling was reserved."); id. advisory committee's note to 1994 amendments ("Reserving a ruling . . . does pose problems . . . where the defense decides to present evidence and run the risk that such evidence will support the government's case. To address that problem, the amendment provides that the trial court is to consider only the evidence submitted at the time of the motion in making its ruling, whenever made.").[14] When the drafters of the

---

[13] The same is true with respect to a plaintiff who fails to obtain judgment mid-trial on the sufficiency of a defense, introduces evidence in rebuttal, and once again moves the court for judgment. The plaintiff will make two arguments: first, the record as it stood at the close of the defendant's case was insufficient to support the defense; second, the record as it stands at the close of all the evidence was insufficient to support the defense.

[14] Federal Rule of Criminal Procedure 29(b) was amended in 1994, and it now reads as quoted in the text. Before the amendment, we applied a different approach. In United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995), we stated, "Defendants in criminal trials are not

procedural rules have intended the outcome dictated by the court's approach, therefore, they have been able to express themselves clearly. In a criminal case, if the court reserves ruling on his motion for judgment of acquittal, the defendant may proceed with his defense in the knowledge that even if the evidence he produces establishes his guilt, the court will not consider that evidence in ruling on his motion. As explained above, however, this is not the rule in civil cases—whether tried to the bench or a jury.

## B.

The court does not doubt the validity of my "approach in the typical civil case and in most future forfeiture cases (given the amendment of the statute)," but says that it is inapplicable in this case. Ante at ___ n. 4. The court explains itself thusly:

> In the typical civil case the same party, the plaintiff, has the burden throughout the trial, and in that context it makes sense to consider all of the evidence presented during the trial in determining whether the plaintiff has met its continuous burden. The authorities cited in the concurring opinion speak to that normal circumstance. But this case is different because of the unusual burden-shifting procedure employed in the forfeiture statute that governs it. Under the pre-

---

obliged to testify. And, a defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case." Consistent with that rule, we said,

> A defendant who presents evidence waives the right to appeal the denial of his Rule 29 motion made and denied at the end of the government's case. Instead, the law of this Circuit is that an insufficiency of the evidence claim . . . will be reviewed taking into account all evidence presented in the case, including evidence put on by the defendant.

Id. at 314 n.3.

53

amendment version of this statute, the government bears the burden of establishing probable cause, and once it has done so the burden shifts to the defendant to establish by a preponderance of evidence either of two defenses, one which is the absence of an illegal drug connection to the property. One might make this argument against Judge Tjoflat's position: It makes no sense to say that evidence introduced after the government has made the showing necessary to shift the burden to the defendant can be used to determine whether the government has made the showing necessary to shift the burden to the defendant.

Id. The court's burden-shifting discussion is a red herring.[15] Under the former version of the statute, it is the government's burden to establish probable cause, and that burden remains with the government until the district court rules on that issue, which may not be until the end of the trial, as in this case.[16] It therefore does

---

[15] I find nothing in the forfeiture statute applicable here or the amended version to support the notion that the burden of proof shifts to the defendant in this way. The court apparently overlooks the fact that both versions incorporate the Supplemental Rules (in particular, the rules I cite in Part II.A) by reference and, further, that the Federal Rules of Civil Procedure also apply (to the extent not inconsistent with the Supplemental Rules). Both the version of Supplemental Rule C(6) applicable in this case and the current version, see supra note 10, require the defendant to file an "answer" to the government's complaint. Neither version suggests the contents of the answer, so to comprehend what the answer might contain, we must look to Fed. RR. Civ. P. 8(b) and 12(b). Rule 8(b), which addresses the form of the defendant's "denials," states that "[a] party . . . shall admit or deny the averments upon which the adverse party relies." Rule 8(b) surely authorized Stanford to file an answer denying the complaint's allegation that the Government had probable cause to believe that the $242,484 Stanford had in her possession were the proceeds of a drug transaction. Further, Rule 8(c) required Stanford to include in her answer "any . . . matter constituting an avoidance or affirmative defense."

[16] The forfeiture provision applicable in the instant case provides for the forfeiture to the United States of the proceeds of drug transactions subject to an innocent owner defense expressed in these words: "no property shall be forfeited . . . to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U.S.C. § 881(a)(6). To bring a civil forfeiture action and to prevail on the merits in this case, the government had to show "probable cause" that the property was subject to forfeiture under the applicable statute, i.e., 21 U.S.C. § 881(a)(6). See 18 U.S.C. § 981(d); 19 U.S.C. § 1615.

make sense to say that Stanford's testimony can be used to determine whether the government established probable cause because the district court had not ruled on that issue when she testified. It is only when the defendant's answer—filed pursuant to Rule C(6) of the Supplemental Rules—admits that the subject property is subject to forfeiture that the government is relieved of this burden.[17] Where the defendant's answer denies that the property is subject to forfeiture, however, the government is put to the proof. If it fails to make out its case, the defendant prevails—on the basis of its answer, not its innocent owner claim.

In the case at hand, the Government's proof carried the day (and thus overcame Stanford's answer), so it became Stanford's burden to prove her claim that she was an "innocent owner" or that the cash was not connected to illegal drug activity. Stanford failed to do this, and the court therefore entered judgment for the Government.

What I have said applies with equal force in cases brought under the amended version of the statute. The same procedural rules apply; thus, if the defendant's answer to the government's complaint denies the conduct rendering the property forfeitable, the government must prove its case. Where, as here, the government's complaint alleges that the property is forfeitable under 21 U.S.C. §

---

[17] In a case where the defendant cannot deny the complaint's allegations without running afoul of Fed. R. Civ. P. 11, the defendant would admit their truth. In that event, the trial would focus solely on the question whether the defendant was an innocent owner.

55

881(a)(6), the only material difference between the forfeiture model we must use and the forfeiture model the amended version has fashioned is that the former requires the government to show "probable cause" to believe that the property is connected to an illegal drug transaction while the latter requires the government to show such connection by "a preponderance of the evidence."[18]

### III.

As I establish in Part II.A., when Stanford chose to present evidence after the district court tentatively denied the motion for judgment she made at the close of the Government's case, she lost the right to have the district court revisit the motion. By the same token, she lost the right to have this court decide whether the district court should have granted the motion.[19] Today, we resurrect that right because "neither party has argued" the point I make—that the district court's decision not to grant Stanford's motion for judgment is not reviewable. Ante at

---

[18] The current forfeiture scheme is laid out in the following statutes: 21 U.S.C. § 881, **Forfeitures**; 18 U.S.C. § 981, **Civil forfeiture**, and 18 U.S.C. § 983, **General rules for civil forfeiture proceedings.** In brief, § 881(a) renders drug proceeds "subject to forfeiture," and § 881(b) authorizes the Attorney General to seize such proceeds "in the manner set forth in [18 U.S.C. §] 981(b)." Section 981(b)(2)(A), in turn, authorizes the Attorney General to seize such proceeds "if a complaint for forfeiture has been filed in the United States District Court and the court issued an arrest warrant in rem pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims." Section 983(c)(1) states that, in that forfeiture action, the government must prove by a preponderance of the evidence that the proceeds are subject to forfeiture. Section 983(d) provides for an "innocent owner" defense, which the defendant must establish by a preponderance of the evidence.

[19] In effect, by choosing to present her own evidence, Stanford put herself in the same position she would have been in had she never made a motion for judgment at all.

56

___ n.4. We "will . . . decide the case as the parties have argued it to us." Id. What the court is really saying is that if the appellee does not inform this court in its answer brief that the appellant "waived" her right to appeal the district court's refusal to grant her motion for judgment, we will review the court's ruling on the merits. We will do this even though the ruling is no longer open to appellate review even under the plain-error doctrine. Cf. United States v. Olano, 507 U.S. 725, 733-34, 113 S. Ct. 1770, 1777, 123 L. Ed. 2d 508 (1993) (holding that in criminal cases plain error review extends to forfeited but not intentionally waived errors under the plain-error doctrine).[20]

The court cites no authority for taking this step. I know of no precedent or legal writing of any kind that supports the proposition that if the appellee does not object, the appellate court will consider on the merits an objection the appellant has waived. What the court is saying is that it will review an objection the appellant has waived—meaning, we will review an error the district court did not make. Put another way, if the appellee—whether deliberately or through sheer negligence—does not defend the district court's judgment by pointing out that the appellant waived the objection she is advancing on appeal, we will consider the

---

[20] If the court's position is correct, then absent the plaintiff's objection, a district court may revisit at the end of the trial—after the defendant has put on evidence that is germane to the plaintiff's case—its denial of the defendant's motion for judgment made at the close of the plaintiff's case-in-chief.

57

objection, notwithstanding the rule of law that bars us from doing so. And if we agree with appellant's argument, we will vacate the judgment.

The court justifies its position in part because, in its view, the district court failed to realize that it could not revisit Stanford's motion at the close of all the evidence. In short, like the Government's counsel, the district court went to sleep at the switch. This is no justification. The Federal Reporter is chocked full of cases in which the court of appeals affirmed the district court judgment for a reason the district court overlooked. If we are going to let the integrity of the district court's judgment turn on the quality of the appellee's answer brief, then we ought to provide the district court with a copy of the brief and grant it leave to comment on the brief's shortcomings. We frequently do this in entertaining mandamus petitions. If the petition appears meritorious on its face, we invite a response from the district court.

This cannot be the result the court intends. As a result, it commits error by consenting to custom-made procedural rules resulting from, at best, the ignorance of the parties, or, at worst, an admixture of the appellant's ingenuity and the appellee's apathy. Thus, although I would reach the same result as the court in this case, I would do so within the plainly applicable Federal Rules of Civil Procedure and forfeiture statutes.

EDMONDSON, Chief Judge, dissents.

BARKETT, Circuit Judge, dissenting:

I do not believe en banc review of the panel's opinion in this case was warranted under our rules, which clearly state that

> [a] petition for en banc consideration . . . is an <u>extraordinary</u> procedure intended to bring to the attention of the entire court a precedent-setting error of exceptional importance in an appeal or other proceeding, and, . . . is intended to bring to the attention of the entire court a panel opinion that is allegedly in direct conflict with precedent of the Supreme Court or of this circuit. Alleged errors in a panel's determination of . . . <u>facts</u> of the case (<u>including sufficiency of the evidence</u>), or error asserted in the panel's <u>misapplication of correct precedent to the facts of the case</u>, are matters for rehearing before the panel but <u>not</u> for en banc consideration.

11th Cir. R. 35-3 (emphasis added). En banc review should not be used simply for a repeat discussion of 1) how an appellate court should view the record and a district court's findings of fact; or 2) to restate the meaning of probable cause, both being clearly established matters of law in this Circuit, which were applied by the panel opinion in this case.

No one disputes that appellate review of the district court's findings of fact requires construing the evidence in the light most favorable to the prevailing party below. See e.g. <u>Dillon v. M.S. Oriental Inventor</u>, 426 F.2d 977, 978 (5th Cir. 1970). The panel opinion in this case clearly recognized and applied this principle.

59

Nor was en banc necessary to address the meaning of probable cause, which was also properly defined by the panel majority. The en banc majority errs in reading into the panel's opinion a requirement for a more heightened form of probable cause[1] simply because the panel recognized that the factual context for civil forfeiture proceedings is different and forfeitures of property are generally not favored in this country. Furthermore, the case law supports this distinction as important. See, e.g., United States v. One 1936 Model Ford V-8 De Luxe Coach, 59 S.Ct. 861, 865 (1939) (finding that the taking of property without compensation "should be enforced only when within both the letter and the spirit of the law."(emphasis added)); see also United States v. $38,000.00, 816 F.2d 1538, 1547 (11th Cir. 1987) ("Forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required.").[2] The en banc court simply reapplies the established law to the facts of this case and reaches a

_____

[1] In this Circuit, as the panel itself recognized, it is undisputed that the same standard of probable cause used in arrest, search, and seizure cases applied to civil forfeiture cases arising prior to the 2000 amendments to the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 881(a)(6) (1994) ("CDAPCA"), see e.g., United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars, 661 F.2d 319, 323 (11th Cir. 1981).

[2] As the en banc majority notes, this is now a moot issue with regard to civil forfeiture proceedings arising on or after August 23, 2000, in light of the 2000 amendments to the CDAPCA. The Civil Asset Forfeiture Reform Act of 2000 raised the burden of proof from probable cause to preponderance of the evidence out of concern, in part, for inadequate protection of private property rights and in order to stop abuses arising from past controversial forfeitures by the government. This is another reason why en banc review should not have been granted.

different conclusion than did the original panel. That is not the purpose of the en banc rule.

Moreover, the original panel correctly concluded that the evidence offered by the government was insufficient to establish probable cause for civil forfeiture, taking into consideration "a common sense view to the realities of normal life." United States v. Carrell, 252 F.3d 1193, 1201 (11th Cir. 2001) (internal citation and quotation marks omitted).[3] Forfeiture should not be permitted here because the circumstances are insufficient to find that the seized money was tied in a substantial way to an illegal drug transaction. While it is arguable that the evidence may support probable cause that the money was connected to some sort of suspicious activity, it fails to establish that it was specifically connected to illegal drug activity as required under the former version of the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 881(a)(6) (1994) ("CDAPCA"); Carrell, 252 F.3d at 1201(holding that there must be a showing by the government that the money was substantially connected to illegal drug transactions).[4]

---

[3] This is so even when we take into consideration the district court's implicit factual findings consistent with its judgment and the totality of the circumstances.

[4] In this Circuit, "[w]e previously have explained that the 'substantial connection' requirement is derived from the legislative history [of 21 U.S.C. § 881(a)(6)], which states [that] [d]ue to the penal nature of forfeiture statutes, it is the intent of these provisions that property would be forfeited only if there is a substantial connection between the property and the underlying criminal activity which the statute seeks to prevent . . . ." United States v. Carrell, 252 F.3d 1193, 1200 n.7 (11th Cir. 2001) (emphasis added) (internal citations and quotation marks omitted).

The en banc majority says that applying "common sense" to the realities "of everyday life" would lead a reasonable fact-finder to conclude that the way in which Stanford conducted her import/export business, by transporting large amounts of cash, gives rise to probable cause that Stanford was not engaged in "a legitimate business." The majority's conclusion is based upon several unwarranted assumptions without evidentiary support. First, the majority makes this statement without any record support for a finding that persons engaged in legitimate businesses only wire money or carry it in large denominations, rather than in cash consisting of small bills. Both Miami and New York are cities filled with immigrants engaged in lawful import/export businesses having nothing to do with drugs that are conducted in ways that may be completely different than what the majority considers to be the "usual" means for running a business. Second, whether or not Stanford was engaged in a "legitimate business" misses the point. The question is not whether the cash carried by Stanford was connected to <u>any</u> illegitimate business, but whether it was specifically linked to drug activity. Although common sense is to be used in how one views the evidence, it cannot be used to <u>supply</u> evidence that does not exist. Here, the majority reaches its conclusion that probable cause existed for civil forfeiture on the basis of suspicion and speculation, rather than sufficient evidence.[5] The probable cause standard

---

[5] It is important to note that when considering some of the evidence that was offered to specifically link the money to drugs rather than just some illegal activity, i.e., the drug-dog alert

62

cannot be satisfied by relying upon suspicion, reasonable or not, or mere speculation.  See United States v. Cleckler, 270 F.3d 1331, 1334 (11th Cir. 2001).

For the foregoing reasons, I dissent.

---

and the DEA's Narcotics and Dangerous Drug Information System ("NADDIS") search on Stanford's business (indicating that the business was possibly used for money laundering), the district court specifically found them to be of negligible value and not very significant.  Also, as one of the DEA agents testified at the probable cause hearing, the number of drug "source cities" includes not only Miami and New York, but Washington D.C., Detroit, Chicago, San Antonio, Los Angeles, San Francisco, Seattle, Tacoma, and Tampa.  Thus, the panel majority was correct to conclude that with increased travel and the subsequent increase in the number of drug "source cities," the value of evidence of travel between those cities as indicative of illegal drug activity has decreased. Furthermore, with regard to the fact that the cash was wrapped in "cellophane-type" wrapping, the district court did not find that the wrapping had the properties one would expect if it were being used to mask the smell of drugs rather than merely being used to prevent the cash from being immediately visually recognized.  Finally, it is also important to note that the district court never made a finding that Stanford or her brother had ever, in any way, previously been involved with any drug crimes.  We have found evidence of a history of involvement with illegal drug transactions probative in other civil forfeiture cases in this Circuit. See e.g. United States v. $121,000.00, 999 F.2d 1503 (11th Cir. 1993).